**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CONSUMERON, LLC, California limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 21-01147-LPS |
| MAPLEBEAR INC. d/b/a INSTACART, a Delaware corporation, | ) ) ) | **DEMAND FOR JURY TRIAL** |
| Defendant. | ) ) | |

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Consumeron, LLC ("Plaintiff" or "Consumeron") files this First Amended

Complaint for Patent Infringement and Demand for Jury Trial against MapleBear Inc. d/b/a

Instacart ("Instacart" or "Defendant") and alleges as follows:

**THE PARTIES**

1.      Consumeron is a California limited liability company with its principal place of

business at 9538 Brighton Way, Beverly Hills, California 90210.

2.      Upon information and belief, Instacart is a Delaware corporation, which

maintains its headquarters at 50 Beale Street, Suite #600, San Francisco, CA 94105.

**JURISDICTION AND VENUE**

3.      This action for patent infringement arises under the patent laws of the United

States, 35 U.S.C. § 101 *et seq.*  This court has original jurisdiction over this controversy

pursuant to 28 U.S.C. §§ 1331 and 1338.

4.      This Court has personal jurisdiction over Instacart because Instacart is

incorporated in Delaware.  Instacart regularly and continuously does business in this District

and has infringed or induced infringement, and continues to do so, in this District.  On

information and belief, Instacart provides systems, applications, websites and/or services to residents in this District.

5.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), (c), and (d), and/or 1400(b).  Instacart is a Delaware corporation and Delaware is a convenient forum for resolution of the parties' disputes with respect to the Counts alleged herein.

## BACKGROUND

6.      When the provisional application for the Asserted Patents was filed in 2009, Internet shopping posed a number of problems.  *See, e.g.,* '191 Patent, 1:22-35 ("there [were] many potential problems associated with ordering goods over the internet,"); Exhibit 14, Declaration of Dr. Glenn Reinman in Support of Consumeron's First Amended Complaint for Patent Infringement ("Reinman Decl."),[1] ¶ 15.  Traditional Internet shopping was crude and relied upon a traditional server architecture in which a user would make an HTTP request for an item to a server and the server would respond with an HTTP response.  Reinman Decl., ¶ 15.  The server, however, did not provide customers with real-time information about products that a customer wished to purchase, but rather provided static information about the product.  Reinman Decl., ¶ 15.  In addition, pictures of goods were often not available or the picture in the HTTP response was inadequate to accurately depict the item.  Reinman Decl., ¶ 15.  Furthermore, customers could not examine an item before the items were purchased because any information on the product was preloaded on the server.  *See, e.g.,* '191 Patent, 1:37-44; Reinman Decl., ¶ 15.  Moreover, there were significant delays with Internet shopping which could takes weeks or months before a purchased item was actually delivered because no system existed for an individual to receive immediate delivery of desired goods.  Reinman

---

[1] Dr. Reinman's Amended Declaration is explicitly incorporated herein.

Decl., ¶ 15; *see, e.g.,* '191 Patent, 1:47-48.

7.      Further, upon receipt of the goods, the goods were often not what the customer actually ordered or not what the customer expected due to the fact that customers could not get real-time information about the goods being purchased over the Internet.  Reinman Decl., ¶ 16. This would often result in the need to return the goods by shipping them back to the source, which was inefficient, costly, and contributed to the large carbon footprint of Internet shopping.   Reinman Decl., ¶ 16.  In addition, Internet shopping failed to provide an option for individuals to quickly, easily, and cost-effectively acquire goods in certain circumstances, such as an elderly person in pain in the middle of the night and unable to drive to a pharmacy.  '191 Patent, 1:47-51; Reinman Decl., ¶ 16.  This deficiency also posed public safety concerns with more dangerous situations, such as an intoxicated individual seeking to drive to purchase something.  '191 Patent, 1:53-56; Reinman Decl., ¶ 16.

8.      For at least these reasons, Consumeron recognized that there was a need for a new system that improved upon the existing technology of Internet shopping.  Consumeron designed and implemented a specialized mobile delivery agent system with real-time imaging and rapid delivery capability ("MDAS") that contained a number of components that were used in unconventional ways.  Consumeron's MDAS provides the ability for a customer to make an HTTP request for an item over the Internet, but rather than returning static information or outdated images as an HTTP response back to the customer, the remote server in the MDAS creates another communication and sends instructions to a device in the MDAS which causes a real-time image of a product at a specific location to be sent to the customer and ultimately deliver the product.  Thus, Consumeron's MDAS provides a specific solution to a technical problem in the field of Internet shopping because it "provides a customer with detailed

information needed to make an informed purchased or acquisition, and which provides rapid delivery of goods" with tangible components that are used to form a system that is not routine and not conventional.  *See, e.g.,* '191 Patent, 1:60-67; Reinman Decl., ¶ 16.

## CONSUMERON'S ASSERTED PATENTS

9.      On August 14, 2012, the United States Patent and Trademark Office ("PTO") issued U.S. Patent No. 8,244,594 (the "'594 Patent") titled Method for Remote Acquisition and Delivery of Goods.  The '594 Patent lists Mark B. Barron and Michael Hays as its inventors. The '594 Patent is assigned to Consumeron.  Attached hereto as Exhibit 1 is a true and correct copy of the '594 Patent.

10.      On December 1, 2015, the PTO issued U.S.  Patent No. 9,202,191 (the "'191 Patent") titled System and Method for Remote Acquisition and Delivery of Goods.  The '191 Patent lists Mark Baron Bowen and Michael Hays as its inventors.  The '191 Patent is assigned to Consumeron.  Attached hereto as Exhibit 2 is a true and correct copy of the '191 Patent.

11.      On October 30, 2018, the PTO issued U.S.  Patent No. 10,115,067 (the "'067 Patent") titled System and Method for Remote Acquisition and Delivery of Goods.  The '067 Patent lists Mark B. Barron and Michael Hays as its inventors.  The '067 Patent is assigned to Consumeron.  Attached hereto as Exhibit 3 is a true and correct copy of the '067 Patent.

12.      On April 21, 2020, the PTO issued U.S.  Patent No. 10,628,835 (the "'835 Patent") titled System and Method for Remote Acquisition and Deliver of Goods.  The '835 Patent lists Mark B. Barron and Michael Hays as its inventors.  The '835 Patent is assigned to Consumeron. Attached hereto as Exhibit 4 is a true and correct copy of the '835 Patent.

13.      The Asserted Patents claim priority back to applications filed in 2009, which is two years before Instacart was founded.

14.     Each of the Asserted Patents claim different aspects of an MDAS with unique server architectures that interact with specialized components to efficiently acquire, using real-time imaging, and rapidly deliver goods that are requested by customer computers over the Internet.

**The Asserted Patents Are Not Directed to Abstract Ideas and Contain Inventive Concepts**

15.     One of ordinary skill in the art understands that the claims of the Asserted Patents are not abstract, but rather directed toward a specific technological system designed to improve upon earlier technological solutions for Internet shopping, and contain inventive concepts as described below.  Reinman Decl., ¶ 17.

**'067 Patent**

16.     Claim 1 of the '067 Patent is directed to a specialized mobile delivery agent system with real-time imaging and rapid delivery capability which converts an acquisition request received over the Internet to instructions for the MDAS and receives real-time communications from a customer based on an electronically transmitted image.  Reinman Decl., ¶ 32.

17.     Claim 1 of the '067 Patent recites:

A method for remote acquisition and delivery of goods comprising:

> at least one remote server receiving, through the internet or a network from a user interface on a customer computer at a first location, a first acquisition request from a first customer for a first set of one or more goods, at a second, service location;
>
> the at least one remote server sending instructions based on the first acquisition request, to a communication device of a mobile delivery agent system located at a third location;
>
> the at least one remote server deploying the mobile agent system from the third location to a fourth, shopping location, having the first set of one or more goods, by providing instructions to the communication device, wherein the mobile

delivery agent system includes: an image capture device and the communication device;

obtaining an image, with the mobile delivery agent system through use of the image capture device, of the first set of one or more goods at the shopping location;

electronically transmitting, with the mobile delivery agent system through use of the communication device, the image of the first set of one or more goods from the shopping location to the customer computer of the first customer;

receiving, with the communication device of the mobile delivery agent system, further instructions from the first customer, through the customer computer, about the first set of one or more goods based on the transmitted image;

acquiring the first set of one or more goods at the shopping location via the mobile delivery agent system; and

delivering the first set of one or more goods from the shopping location to a delivery site.

18.     In traditional Internet shopping, an HTTP request is sent to a server which responds with an HTTP response regarding an item that a customer wishes to purchase. Reinman Decl., ¶¶ 15, 32.  This resulted in a number of problems, as discussed above. Reinman Decl., ¶ 32.  The '067 Patent solves these problems with a specialized MDAS computer system.  Reinman Decl., ¶ 32.  Claim 1 of the '067 Patent discloses at least one remote server that receives a customer's acquisition request for a first set of one or more goods through a user interface over the Internet.  Rather than simply responding to the request as would be typical for a server, the remote server is unique because it transmits instructions to a communication device in an MDAS.  *See, e.g.,* '067 Patent, Claim 1; Reinman Decl., ¶¶ 33-35. The remote server, also in a non-traditional sense, deploys the MDAS from one location to a shopping location that has the goods the customer is requesting.  *See, e.g.,* '067 Patent, Claim 1; Reinman Decl., ¶¶ 33-35.  At this point, the MDAS, which is a new type of system, obtains an image of the product and electronically transmits the image from the actual location

of the goods to the customer's computer.  *See, e.g.,* '067 Patent, Claim 1; Reinman Decl.,

¶¶ 33-35.  The MDAS then receives additional instructions based on the transmitted images,

thus solving the issues of static information and inaccurate product descriptions involved in

Internet shopping.  *See, e.g.,* '067 Patent, Claim 1; Reinman Decl., ¶¶ 33-35.  The products are

then acquired via the MDAS and delivered to a delivery site, which provides a rapid delivery

system that was not in existence in 2009. *See, e.g.,* '067 Patent, Claim 1; Reinman Decl.,

¶¶ 33-34.  Thus, Claim 1 does not describe generic computer components, but rather particular,

specialized pieces of a computer system and assigns particular functions to each, including the

MDAS which was not in existence before 2009.  Reinman Decl., ¶ 36.  In addition, Claim 1

changes the normal operation of a traditional request-response server architecture because the

remote server sends instructions to the MDAS rather than merely responding to the customer's

request via an HTTP response from the server.  Reinman Decl., ¶ 36.  Claim 1 also provides a

specific improvement over traditional Internet shopping systems because it allows a customer

to receive a real-time image of a product and provide instruction in response to that image.

Reinman Decl., ¶ 36.  Further, Claim 1 explains how each of the components work together,

including how the remote server receives an acquisition request, how the MDAS interacts with

the remote server, and how the MDAS provides and receives real-time feedback from the

customer.  Reinman Decl., ¶ 36.

19.   Claim 1 of the '067 Patent also provides an inventive concept because it

provided a novel and unconventional use of a server and MDAS in which a server changes a

customer request received over the Internet and facilitates communication to the MDAS which

permits a customer to provide real-time feedback in response to an electronically transmitted

image, such that the MDAS can carry out delivery of the product in response to the acquisition

request.  Reinman Decl., ¶ 36.  Indeed, the '067 Patent specifically states images may not have been available to customers at all, or if so, they may not have been accurate depictions of the goods and no good solution existed for an individual to receive immediate delivery of desired goods ordered through Internet shopping, highlighting that Claim 1 of the '067 Patent contains an inventive concept because the elements specifically addresses these issues.  *See, e.g.,* '067 Patent, 1:46-53; Reinman Decl., ¶ 15.  In other words, the MDAS is non-conventional because it did not exist prior to Consumeron creating the system, and it uses components in ways that were not routine, as discussed above.  Furthermore, the MDAS does not invoke a conventional business practice because there was no business that had the ability to provide real-time images of products and provide the immediate delivery of goods, as described in the specification. *See, e.g.,* '067 Patent, 1:46-53, 7:22-26; Reinman Decl., ¶ 15.

20.    In addition, this improved existing request-response server technology, in which a merely server responded a customer HTTP request such that the customer was not able to receive and respond to product information, including images, in real-time.  This in turn improved Internet shopping.  Reinman Decl., ¶ 20.  Further, Claim 1 also recites specific limitations not previously available in the art and beyond what would be routine or conventional, including the use of particular specialized machinery such as the MDAS which includes a digital image capture device and a communication device, and improved upon a typical Internet shopping purchasing method, such as by electronically transmitting, in real-time, images of the goods to the customer computer and the ability to receive further instruction from the customer about the goods based on the transmitted image.  '067 Patent, Claims 1; Reinman Decl., ¶¶ 33-36.

21.    Specifically, Claim 1 of the '067 Patent provides specific and concrete

technologies that provide particular improvements in Internet shopping, as well as improving server architecture for a particular purpose, and improving goods acquisition and delivering, all of which are rooted in computer technology because it requires a request over the Internet, the electronic transmission of images, and real-time feedback.  Reinman Decl., ¶¶ 33-36.  The claimed abilities of the MDAS were not well-known, conventional or routine: the ability to send a plurality of locations to a server that in turn uses that data to provide instructions and a real-time feed of locations and movements to another device; the ability to send electronically transmitted images from a device through a server to a customer device, thereby providing a means for customer review and approval in real-time; and the ability to enable a line of communication amongst a mobile delivery agent, customer computer, and third party systems vis à vis a new server architecture and MDAS.  Reinman Decl., ¶¶ 33-36.  In other words, Claim 1 of the '067 Patent discloses more than just a simple combination of generic components to perform conventional activities because it specifies a brand-new system, the MDAS and unique remote server, and uses real-time imaging and customer feedback to ensure the rapid delivery of goods. Reinman Decl., ¶¶ 33-36.  Furthermore, the MDAS is a not a generic arrangement of components, as the MDAS is a new system that was not previously available, and it uses components in a non-traditional sense, such as the server which does not merely respond to requests, as discussed above.  Reinman Decl., ¶¶ 33-36.

22.     Dependent claims explain that the MDAS selection process includes the server providing to the customer communications device information on the mobile delivery agent system's location ('067 Patent, Claim 3), and receiving an acquisition request from the customer that includes a selection of a mobile delivery agent to fulfill the request ('067 Patent, Claim 4).  Reinman Decl., ¶¶ 51-53.  Additionally, dependent claims provide an alternative

selection means, disclosing specific roles of the specialized processor of the server, the MDAS and the GPS device in calculating and selecting the most efficient MDAS relative to the pick-up site based on current location of the agents provided to the server via the unconventional use of the GPS data of the mobile delivery agent system remotely, rather than allowing such calculation to happen at the site of the delivery agent.  '067 Patent, Claim 5; Reinman Decl., ¶¶ 51-53.

23.     Dependent claims also disclose the server further communicating with the customer communications device about the products, including obtaining consent to acquire the goods.  '067 Patent, Claim 7; Reinman Decl., ¶¶ 51-53.  Further, dependent claims explain the specialized nature of the mobile delivery agent system's image capture device, which must be configured to allow for streaming real-time video of the mobile delivery agent's view of the products to the customer computer ('067 Patent, Claim 18); Reinman Decl., ¶¶ 51-53.  Moreover, dependent claims also disclose the capacity for a second delivery, teaching a server receiving a second acquisition request, electronically transferring to the customer communications device a second set of product images, and acquiring and delivering them.  '067 Patent, Claim 11; Reinman Decl., ¶¶ 51-53.  Finally, dependent claims also elaborate on the server's coordination with the GPS and imaging device of the mobile delivery agent system, disclosing the server providing the customer communications device the mobile delivery agent system's real-time street view.  '067 Patent, Claim 10; Reinman Decl., ¶¶ 51-53.  All of these additional elements demonstrate that the claims are directed to an unconventional solution that was an improvement over the prior art.  Reinman Decl., ¶¶ 51-53.

24.     In addition, there are no preemption concerns because, for example, Claim 1, discloses a specific, specialized system, with specific components, such as an MDAS and

remote server, that improves upon Internet shopping.  Reinman Decl., ¶ 36.  Claim 1 does not foreclose all methods of Internet shopping or even the delivery of goods because it uses these specialized components, in a specific way, as discussed above.  Reinman Decl., ¶ 36.

25.     All of the claims of the '067 Patent are not abstract and contain inventive concepts for the same reasons discussed above, although all of the claims have different scopes.  Reinman Decl., ¶ 53.

## '191 Patent

26.     Claim 11 of the '191 Patent is directed to a specialized mobile delivery agent system with a real-time video device that enables a user to view goods at a pick-up site and provide approval for the immediate purchase of goods and a selectable widget for a website to generate views of the goods at a pick-up site.  Reinman Decl., ¶ 23.

27.     Claim 11 of the '191 Patent recites:

A system for remote acquisition and delivery of one or more goods based on an acquisition request from a customer through an interactive interface for processing the acquisition request comprising:

> a plurality of mobile delivery agent systems configured with at least a global positioning system providing location information to at least one server;

> a selectable widget for a third party vendor website configured to retrieve data submitted by the plurality of mobile delivery agent systems to the at least one server and to generate a view of a pick-up site associated with the third party vendor together with at least the data submitted to the at least one server by the plurality of mobile delivery agent systems including current locations of the mobile delivery agent systems;

> a display for displaying to the customer at least the generated view;

> an input configured to receive the acquisition request and a selection made by the customer of one of the plurality of delivery agent systems representing delivery agents;

> communication means for processing the acquisition request from the customer and establishing direct communication between the customer and the selected

delivery agent during both the acquisition and delivery of the one or more goods to the customer; and

a real-time video means for sending at least one image to the customer through the communication means and transmitting real-time data to the display for the customer to view the one or more goods and the respective agent's progress during performance of the acquisition request.

28.    As discussed above, in traditional Internet shopping, an HTTP request is sent to a server which responds with an HTTP response regarding an item that a customer wishes to purchase.  Reinman Decl., ¶¶ 15, 23.  This resulted in a number of problems, particularly the problem that arises when the user is not able to confirm in real-time that the product the user wishes to purchase over the Internet is the actual product the user will receive.  Reinman Decl., ¶ 23.  Claim 11 of the '191 Patent solves these problems with a specialized computer system that provides real-time imaging during an acquisition request.  Reinman Decl., ¶ 23.  Claim 11 of the '191 Patent discloses a number of MDAS that are configured with a global positioning system ("GPS") providing location information to a server.  Reinman Decl., ¶¶ 25-29.  This is not a typical use of GPS in 2009 because typically GPS involved a user looking at a map which provides the user with his or her location.  *See, e.g.,* '191 Patent, Claim 11; Reinman Decl., ¶¶ 25-29.  Claim 11 of the '191 Patent uses GPS in a different and unique way because it takes the GPS information from the MDAS and sends it to a server so that a third party, namely the customer, can view the current location of the MDAS.  Reinman Decl., ¶¶ 25-29.  In addition, Claim 11 contains a selectable widget, which is rooted in computer technology, which retrieves MDAS data submitted to the server to generate a view of the pick-up site.  Reinman Decl., ¶¶ 25-29.  As such, the selectable widget is a particular piece of software, with a particular function, which improves upon Internet shopping because Internet shopping did not have the capability to generate views of pick-up sites.  *See, e.g.,* '191 Patent, Claim 11; Reinman Decl.,

¶¶ 25-29.  Claim 11 also recites the capability for a customer to select an MDAS which goes beyond Internet shopping which is limited to the purchasing of unseen goods in 2009. Reinman Decl., ¶¶ 25-29.  Claim 11 also has the ability for a communication means to have direct communication between the customer and the selected delivery agent, again, something that was not available with traditional Internet shopping technology and solves the problem of goods being described incorrectly on a website.  Reinman Decl., ¶¶ 25-29.  Claim 11 further includes a real-time video means which is a tangible object used in a non-traditional sense that improves Internet shopping because it transmits real-time data to the display of a customer to view the goods and the agent's progress.  Reinman Decl., ¶¶ 25-29.  Thus, Claim 11 does not describe generic computer components, but rather particular, specialized pieces of a computer system and assigns particular functions to each, including the MDAS and how it interacts with GPS and provides real-time data to a customer which was not in existence before 2009. Reinman Decl., ¶ 30.  In addition, Claim 11 changes the normal operation of traditional GPS and request-response server architecture because the GPS is not used to navigate a user on a map, but rather to provide a visual display of the location of an MDAS to a third-party (the customer).  The server in Claim 11 also changes the operation of a normal sever because it provides information to a selectable widget for a third party vendor which uses the information to provide a view of the pick-up site.  Reinman Decl., ¶¶ 29-30.  Claim 11 also provides a specific improvement over traditional Internet shopping systems because it allows a customer to receive real-time data of a product and provides real-time information regarding the acquisition and delivery of goods.  Reinman Decl., ¶ 30.  Further, Claim 11 explains how each of the components work together, including how the server receives and uses GPS, how the selectable widget provides information, and how the communication means and real-time

delivery means operate in the overall system.  Reinman Decl., ¶ 30.  Claim 11 reflects

deliberate choices about which component play which part in the overall system.  Reinman

Decl., ¶ 30.

29.     Claim 3 also includes a server that stores customer information, including

delivery address, billing, and historical purchase information, which further cements the

system in computer technology.  '191 Patent, Claim 3; *see also* '191 Patent at 2:2-5; Reinman

Decl., ¶ 53.  Dependent claims 4, 7 and 8 further describe a unique system rooted in computer

technology that fulfills a customer request using GPS to locate and display nearby and

available mobile delivery agent systems and an associated selectable widget to the client's

communication device that enables the customer to communicate a choice back to the server or

by automatically selecting an appropriate delivery agent for the customer according to the

server's processor with a decision algorithm   '191 Patent, Claim 4, Claim 7, Claim 8; *see also*

'191 Patent at 5:10-12; Reinman Decl., ¶ 51.

30.     Claim 11 of the '191 Patent also provides an inventive concept because it covers

a novel and unconventional use of a server architecture in which an acquisition request is

received by a customer as well as a selection corresponding to the delivery agent systems, and

direct communication is established which allows a real-time data about a product to be sent

and the progress of the acquisition is tracked.  Reinman Decl., ¶¶ 25-30.  This, in turn, is a

technical improvement over the prior art, including an improvement over Internet shopping.

Reinman Decl., ¶¶ 25-30.  Indeed, Claim 11 of the '067 Patent provides specific and concrete

technologies that provide particular improvements in Internet shopping, as well as improving

server architecture for a particular purpose, and improving goods acquisition and delivery, all

of which are rooted in computer technology because it requires a request over the Internet, the

14

electronic transmission of images, and real-time feedback and tracking of progress of the acquisition request.  Reinman Decl., ¶¶ 25-30.  Further, Claim 11 also recites specific limitations not previously available in the art and beyond what would be routine or conventional, including the use of particular specialized machinery such as the MDAS including a GPS, digital image capture device, and a communication device, and improve upon a typical internet shopping, such as by electronically transmitting, in real-time, GPS data and information on the goods to the customer computer using the GPS and digital image capture device of an agent and allows progress to be tracked.  *See, e.g.* '191 Patent, Claims 11; Reinman Decl., ¶¶ 25-30.

31.     Specifically, Claim 11 of the '191 Patent covers specific and concrete technologies that effect particular improvements in Internet shopping, provides a server architecture that receives and uses GPS data in a non-conventional way (as described above), uses a selectable widget that provides a view of pick-up sites, and provides goods acquisition and delivery which was not available before.  Reinman Decl., ¶¶ 25-30.  Claim 11, as well as the other claims, recites abilities of an MDAS that were not well-known, conventional or routine: the ability to send a plurality of locations to a server that in turn uses that data to provide instructions and/or a real-time feed of locations and movements to another device; to send electronically transmitted images from a device through a server to a customer device, thereby providing a means for the customer to view the goods and track progress; and the ability to enable a line of communication amongst a mobile delivery agent, customer computer, and third party systems vis à vis a server architecture and MDAS.  *See, e.g,* '191 Patent, Claim 11; Reinman Decl., ¶¶ 25-30.  In other words, Claim 11 of the '191 Patent discloses more than just a simple combination of generic components to perform conventional activities because it

discloses new systems, such as the MDAS, and uses computer specific components, such as a selectable widget.  *See, e.g,* '191 Patent, Claim 11; Reinman Decl., ¶¶ 25-30.  Furthermore, the MDAS is a not a generic arrangement of components, as the MDAS is a new system that was not previously available, and it uses components in a non-traditional sense, such as the server which does not merely respond to requests, as discussed above.  *See, e.g,* '191 Patent, Claim 11; Reinman Decl., ¶¶ 25-30.

32.     Indeed, the '191 Patent specifically states that images may not have been available to customers at all, or if so, they may not have been accurate depictions of the goods, and no good solution existed for an individual to receive immediate delivery of desired goods ordered through Internet shopping, highlighting that Claim 11 of the '191 Patent contains an inventive concept because the elements specifically address these issues.  *See, e.g.,* '191 Patent, 6:56-59; Reinman Decl., ¶ 15.  In other words, the MDAS is non-conventional because it did not exist prior to Consumeron creating the system, and it uses components in ways that were not routine, as discussed above.  Furthermore, the MDAS does not invoke a conventional business practice because there was no business that had the ability to provide real-time images of products, uses a selectable widget and provide the immediate delivery of goods as well as tracking the progress of the acquisition, as described in the specification.  *See, e.g.,* '191 Patent, 1:40-49, 6:56-59; Reinman Decl., ¶ 15.

33.     Dependent claims explain that the mobile delivery agent system selection process includes the server providing to the customer communications device information on the mobile delivery agent system's location.  '191 Patent, Claim 8; Reinman Decl., ¶¶ 51-53. Dependent claims also provide an alternative selection means, disclosing specific roles of the specialized processor of the server, the mobile delivery agent system and the GPS device in

calculating and selecting the most efficient mobile delivery agent system relative to the pick-up site based on current location of the agents provided to the server via the GPS devices of the mobile delivery agent system.  '191 Patent, Claim 4; Reinman Decl., ¶¶ 51-53.  Further, dependent claims explain the specialized nature of the mobile delivery agent system's image capture device, which must be configured to allow for streaming real-time video of the mobile delivery agent's view of the products to the customer computer.  '191 Patent, Claim 12; Reinman Decl., ¶¶ 51-53.  Moreover, dependent claims specify that a specialized widget is used to establish a communication link between the mobile delivery agent and customer communications device.  '191 Patent, Claim 16; Reinman Decl., ¶¶ 51-53.  Finally, dependent claims also elaborate on the server's coordination with the GPS and imaging device of the mobile delivery agent system, disclosing the server providing to the customer communications device the mobile delivery agent system's location.  '191 Patent, Claim 10; Reinman Decl., ¶¶ 51-53.

34.     In addition, there are no preemption concerns because, for example, Claim 11, discloses a specific, specialized system, with specific components, such as an MDAS, server, and selectable widget, that improves upon Internet shopping.  Reinman Decl., ¶ 30.  Claim 11 does not foreclose all methods of Internet shopping or even the delivery of goods because it uses these specialized components, in a specific way, as discussed above.  Reinman Decl., ¶ 30.

35.     All of the claims of the '191 Patent are not abstract and contain inventive concepts for the same reasons discussed above, although all of the claims have different scopes.  Reinman Decl., ¶ 30.

**'835 Patent**

36.     Claim 26 of the '835 Patent is directed to a specialized mobile agent system that includes software that permits a customer to inspect and approve the purchase of a particular product exactly as shown in an electronically transmitted real-time image and providing delivery of the particular product to a delivery site.  Reinman Decl., ¶ 38.

37.     Claim 26 of the '835 Patent recites:

A method for remote acquisition and delivery of goods comprising:

> locating a plurality of agents of a service provider at various geographic locations, each agent having a mobile agent system in communication with at least one remote server, wherein each mobile agent system includes: a
>
> digital image capture device, a global positioning system and a communication device;
>
> sending to a first customer, information on at least one of the plurality of agents, including location information based on signals from the global positioning system;
>
> receiving a first acquisition request from a first customer for a first set of one or more goods;
>
> contacting one of the plurality of agents for a location having the first set of one or more goods;
>
> electronically transmitting, in real-time, information on the first set of one or more goods to the first customer using the digital image capture device of the agent, including obtaining an image of a particular product of the first set of the one or more goods and sending the image for the first customer to inspect and approve the purchase of the particular product exactly shown in the image;
>
> acquiring the particular product, via the agent; and providing for delivery of the particular product to a delivery site.

38.     With traditional Internet shopping in 2009, there was no ability for a customer to know exactly what they are getting when an order is placed on the Internet, and delivery is significantly delayed.  Reinman Decl., ¶¶ 15, 38.  This resulted in a number of problems, as

discussed above, particularly when the user must send back goods that are not accurately described, or worse yet, causes a customer to not use the Internet to shop at all. Claim 26 of the '835 Patent solves this problem because it is directed to a specific technological system designed to improve upon Internet shopping because it includes software that works with a mobile agent system that allows a customer to see, in real-time, information about the goods a customer wishes to purchase and allows the customer to inspect and approve the purchase of that exact good. Reinman Decl., ¶ 38. Furthermore, Claim 26 recites the use of particular pieces of equipment, including a remote server that is specialized because it does not merely send an HTTP response back to an acquisition request from a customer, but contacts the mobile delivery agent system which, in turn, sends a real-time image of the exact product and verifies that the customer wishes to purchase the product. Reinman Decl., ¶ 41. Moreover, Claim 26 provides for the delivery of the exact product that the customer inspected and approved in real-time over the Internet. Reinman Decl., ¶ 41. Claim 26 of the '835 Patent also discloses a unique, concrete and untraditional use of GPS in that the location information from the mobile agent system is sent to a third party, which here is the customer. Reinman Decl., ¶ 42. This is not a typical use of GPS in 2009 because typically GPS involved a user looking at a map which provides that user with his or her location. Reinman Decl., ¶ 42. Claim 26 of the '835 Patent uses GPS in a different and unique way because it takes the GPS information from the mobile agent systems and sends it to the customer. Reinman Decl., ¶ 42. Thus, Claim 26 does not describe generic computer components, but rather particular, specialized pieces of a computer system and assigns particular functions to each, including the mobile agent system and how it interacts with remote server and GPS to provide real-time data to a customer which was not in existence before 2009. Reinman Decl., ¶ 44. In addition, Claim 26

changes the normal operation of traditional GPS and request-response server architecture because the GPS is not used to navigate a user on a map, but rather provides location information to a third-party (the customer).  Reinman Decl., ¶ 42.  The server also changes the operation of a normal sever because it provides information based on a customer request over the Internet to a mobile agent system which uses the information to ensure the exact product the customer desires is delivered.  '835 Patent, Claim 26; Reinman Decl., ¶ 41.  Claim 26 also provides a specific improvement over traditional Internet shopping systems because it allows a customer to receive real-time images of a product that allows a customer to inspect and approve the product.  Reinman Decl., ¶ 41.  Further, Claim 26 explains how each of the components work together, including how the server receives and uses GPS, how images are used, and describes the interaction of all of the components of the system.  Reinman Decl., ¶ 44.  Like all of the claims of the Asserted Patents, Claim 26 reflects deliberate choices about which components play which part in the overall system.  Reinman Decl., ¶ 44.

39.     Dependent claim 27 of the '835 Patent also discloses the utilization of bar codes or QR codes in a way that was not conventional, routine or well-known, in that the customer scans such codes in order to establish an acquisition request which was simply not done before in prior systems.  Reinman Decl., ¶ 53.

40.     Dependent claim 25 further claims that the digital image capture device of the agent be specialized to transmit information obtained from scanning one or more bar codes or QR codes to provide additional data in real time regarding the requested goods, for which real-time images were obtained by the agent device and transmitted electronically to the customer.  Reinman Decl., ¶ 53.  At the time of the invention, such a use of image capture devices to scan bar codes or QR codes to electronically transmit data to a customer in real-time via a mobile

agent system was not a conventional, well-known or routine use of an image capture device and, in fact, not used at all in any system.  The mobile agent system is thus specialized to perform specific functionality within the remote acquisition and delivery system.  Reinman Decl., ¶ 53

41.     Claim 26 also discloses an inventive concept because it provides a novel and unconventional use of a server architecture in which a server transforms an acquisition request to a communication to the mobile agent system rather than merely providing an HTTP response, and provides for a mobile agent system that allows a customer to review an image and inspect and approve a particular product exactly as shown, and facilities the delivery of the particular product to a delivery site.  This is, in turn, is a technology improvement over the prior art, including an improvement over Internet shopping.  Reinman Decl., ¶ 44.  Further, Claim 26 recites specific limitations not previously available in the art and beyond what would be routine or conventional, including the use of particular specialized machinery such as the mobile delivery agent system, GPS, digital image capture device, and a communication device, and improve upon a typical internet shopping purchasing method, such as by electronically transmitting, in real-time an image of the product so that it can be approved.  '835 Patent, Claims 1, 24, 26; Reinman Decl., ¶¶ 41-44.

42.     Specifically, Claim 26 provides specific and concrete technologies that provide particular improvements in Internet shopping, as well as improving server architecture for a particular purpose, and improving goods acquisition, real-time product approval based on the transmission of electronic images, all of which are rooted in computer technology because it requires a request over the Internet, the electronic transmission of images, and real-time feedback.  Reinman Decl., ¶¶ 41-44.  The claimed abilities of the mobile agent system were not

well-known, conventional or routine because the ability to send a plurality of locations to a server that in turn uses that data to provide instructions and/or a real-time feed of locations and movements to another device, the ability to send electronically transmitted images for inspection and approval, and the ability to enable a line of communication amongst a mobile delivery agent and customer computer were simply not available in the prior art.  Reinman Decl., ¶¶ 41-44.  In other words, the '835 Patent discloses more than just a simple combination of generic components to perform conventional activities because it discloses a new system. *See, e.g.* '835 Patent, Claim 26; Reinman Decl., ¶¶ 41-44.  Furthermore, the mobile agent system is a not a generic arrangement of components, as the mobile agent system is a new system that was not previously available, and it uses components in a non-traditional sense, such as the server, which does not merely respond to requests, as discussed above.  *See, e.g.* '835 Patent, Claim 26; Reinman Decl., ¶¶ 41-44.

43.     Indeed, the '835 Patent specifically states that images may not have been available to customers at all, or if so, they were not accurate depictions of the goods, and no good solution existed for an individual to receive immediate delivery of desired goods ordered through Internet shopping, highlighting that Claim 26 of the '835 Patent contains an inventive concept because the elements specifically address these issues.  '835 Patent, 1:48-57; Reinman Decl., ¶ 15.  In other words, the mobile agent system is non-conventional because it did not exist prior to Consumeron creating the system, and it uses components in ways that were not routine, as discussed above.  Reinman Decl., ¶ 39.  Furthermore, the mobile agent system does not invoke a conventional business practice because there was no business that had the ability to provide real-time images of products with the ability to inspect and approve products, and have the exact products delivered to delivery site, as described in the specification.  '835

22

Patent, 1:48-57, 7:27-31; Reinman Decl., ¶ 54.

44.     Dependent claims explain that the mobile delivery agent system selection process includes the server providing to the customer communications device information on the mobile delivery agent system's location ('835 Patent, Claim 4), and receiving an acquisition request from the customer that includes a selection of a mobile delivery agent to fulfill the request ('835 Patent, Claim 3).  Reinman Decl., ¶¶ 51-53.  Dependent claims also disclose the server further communicating with the customer communications device about the products, including obtaining consent to acquire the goods.  '835 Patent, Claim 6; Reinman Decl., ¶¶ 51-53.  Further, dependent claims explain the specialized nature of the mobile delivery agent system's image capture device, which must be configured to allow for streaming real-time video of the mobile delivery agent's view of the products to the customer computer. '835 Patent Claims 14, 15; Reinman Decl., ¶¶ 51-53.  Additionally, the dependent claims also disclose the capacity for a second delivery, teaching a server receiving a second acquisition request, electronically transferring to the customer communications device a second set of product images, and acquiring and delivering them.  '835 Patent, Claim 9; Reinman Decl., ¶¶ 51-53.  Finally, the dependent claims also elaborate on the server's coordination with the GPS and imaging device of the mobile delivery agent system, disclosing the server providing the customer communications device the mobile delivery agent system's real-time street view. '835 Patent, Claim 7; Reinman Decl., ¶¶ 51-53.  All of these dependent claims further support that the claims are not abstract because they recited specific components of a tangible system and disclose an inventive conception because there was no arrangement of these components in such a way before the '835 Patent was filed.  Reinman Decl., ¶¶ 51-53.

45.     In addition, there are no preemption concerns because, for example, Claim 26,

discloses a specific, specialized system, with specific components, such as an MDAS and remote server, that improves upon Internet shopping. Reinman Decl., ¶ 44. Claim 26 does not foreclose all methods of Internet shopping or even the delivery of goods because it uses these specialized components, in a specific way, as discussed above. Reinman Decl., ¶ 44.

46.     All of the claims of the '835 Patent are not abstract and contain inventive concepts for the same reasons discussed above, although all of the claims have different scopes. Reinman Decl., ¶ 44.

### '594 Patent

47.     Claim 13 of the '594 Patent is directed to a specialized MDAS that uses a server which calculates and determines the most efficient delivery agent based on the location of goods, global positioning data, and delivery site, and uses a real-time video device to electronically transfer an image of a particular good and causing delivery of that good. Reinman Decl, ¶46.

48.     Claim 13 of the '594 Patent recites:

A method for remote acquisition and delivery of goods comprising:

deploying a plurality of delivery agents of a service provider to various geographic locations, each delivery agent having a mobile delivery agent system in communication with at least one remote server, wherein each mobile delivery agent system includes: a real-time video device, a communication device and a global positioning device;

receiving a first acquisition request from a first customer for a set of one or more goods;

after receiving the first acquisition request, calculating which of the plurality of delivery agents could most efficiently carry out the first acquisition request using the at least one remote server, with the calculation being based, at least in part, on a location having the first set one or more goods, a current location of the delivery agent as determined utilizing the global positioning device, and the delivery site:

deploying one of the plurality of delivery agents to the location having the first set of one or more goods based, at least in part, on the calculation;

electronically transferring an image of the first set of one or more goods to the first customer using the real-time video device;

acquiring the first set of one or more goods via the delivery agent; and

delivering the first set of one or more goods to a delivery site selected by the first customer.

49.     The '594 Patent solves problems of Internet shopping and delivery as it discloses a remote system which performs calculations based on location data of a first set of goods, the current location of a delivery agent as determined utilizing global positioning data, and a delivery site.  Reinman Decl, ¶ 46.  In 2009, such systems simply did not exist.  Reinman Decl., ¶ 47.  Further, Claim 13 is direct to a specific technological system designed to improve upon Internet shopping because it electronically transfers images of goods in real-time, thereby avoiding the situation in which a product is described inaccurately on the Internet.  Reinman Decl., ¶ 47.  Claim 13 also effectuates the most efficient delivery in response to a customer site selected by the customer which ensures the correct goods are delivered to the correct destination in a timely manner.  Reinman Decl., ¶ 47.  Claim 13 also recited tangible, concrete, devices that interact together, such as a MDAS that includes a real-time video device, a communication device, and a global positioning device.  Reinman Decl., ¶ 50.  The server of Claim 13 is not the normal operation of a server, but rather receives acquisition requests over the Internet, and rather than merely provide a response, performs a calculation to determine the most efficient delivery of the particular goods based on the location of the goods.  Reinman Decl., ¶ 50.  Thus, Claim 13 does not describe generic computer components, but rather particular, specialized pieces of a computer system and assigns particular functions to each, including the MDAS and how it interacts with remote server and GPS to provide the most efficient delivery of the actual goods that a user desires, rather than a speculative product that

may not actually be available on the Internet.  Reinman Decl., ¶ 50.  In addition, Claim 13 changes the normal operation of traditional GPS and request-response server architecture because the GPS is not used to navigate a user on a map, but rather used in conjunction with the location of the goods and the delivery site to ensure that the delivery is the most efficient. Reinman Decl., ¶ 49.  The server also changes the operation of a normal sever because it provides information based on a customer request over the Internet to a MDAS that uses the information to ensure the exact product the customer desires is delivered.  '594 Patent, Claim 13; Reinman Decl., ¶¶ 49-50.  Claim 13 also provides a specific improvement over traditional Internet shopping systems because it allows a customer to receive real-time images of a product allows a customer to inspect and approve of the product.  Reinman Decl., ¶ 49. Further, Claim 13 explains how each of the components work together, including how the server receives and uses GPS, how images are used, and what information is used to perform the necessary calculation for efficient delivery.  Reinman Decl., ¶ 50.  Like all of the claims of the Asserted Patents, Claim 13 reflects deliberate choices about which components play which part in the overall system.  Reinman Decl., ¶ 50.

50.     Claim 13 of the '594 Patent discloses an inventive concept because it recites a novel and unconventional use of a server architecture that improved existing request-response server technology, in which a server receives an acquisition request and rather than merely providing an HTTP response, calculates the most efficient delivery, deploys delivery agents, and electronically transmits images in real-time to ensure the correct goods are delivered. Reinman Decl., ¶ 46.  This, in turn, is a technological improvement over the prior art, including an improvement to Internet shopping.  Reinman Decl., ¶ 46.  Further, the Asserted Patents also recite specific limitations not previously available in the art and beyond what would be routine

or conventional, including the use of particular specialized machinery such as the mobile

delivery agent system including a GPS, digital image capture device, and a communication

device, and improve upon a typical Internet shopping purchasing method, such as by

electronically transmitting, in real-time, image data.  '594 Patent, Claims 1, 13; Reinman Decl.,

¶¶ 46-50.

51.     Specifically, Claim 13 of the '594 Patent provides specific and concrete

technologies that provide particular improvements in Internet shopping, as well as improving

server architecture for a particular purpose, all of which are rooted in computer technology

because it requires a request over the Internet, calculation of a delivery based on GPS data

from separate systems, and the electronic transmission of images.  These abilities were not

well-known, conventional or routine.  Reinman Decl., ¶¶ 46-50.  In other words, the '594

Patent discloses more than just a simple combination of generic components to perform

conventional activities because it describes a new MDAS system and new way of calculating

delivery for the MDAS.  Reinman Decl., ¶¶ 46-50.  Furthermore, the MDAS is a not a generic

arrangement of components, as the MDAS is a new system that was not previously available,

and it uses components in a non-traditional sense, such as the server which does not merely

respond to requests, as discussed above.  Reinman Decl., ¶¶ 46-50.

52.     Indeed, the '594 Patent specifically states images may not have been available

to customers at all, or if so, they were not accurate depictions of the goods, and no good

solution existed for an individual to receive immediate delivery of desired goods ordered

through Internet shopping, highlighting that Claim 13 of the '594 Patent contains an inventive

concept because the elements specifically addresses these issues.  '594 Patent, 1:38-46;

Reinman Decl., ¶ 15.  In other words, the MDAS is non-conventional because it did not exist

prior to Consumeron creating the system, and it uses components in ways that were not routine, as discussed above.  Furthermore, the MDAS does not invoke a conventional business practice because there was no business that had the ability to provide real-time images of products and provide the immediate delivery of goods, as described in the specification.  '594 Patent, 6:55-58; Reinman Decl., ¶ 15.

53.     Dependent claims explain that the mobile delivery agent system selection process includes the server providing to the customer communications device information on the mobile delivery agent system's location ('594 Patent, Claim 17), and receiving an acquisition request from the customer that includes a selection of a mobile delivery agent to fulfill the request ('594 Patent, Claim 16).  Reinman Decl., ¶¶ 51-53.  This demonstrates the unconventional utilization of the GPS system on the MDAS by the server, rather than simply providing GPS data to the individual user of the GPS system.  Dependent claims also disclose the server further communicating with the customer communications device about the products, including obtaining consent to acquire the goods based on the unconventional use of the imaging system to provide real-time data about the goods to the computer ('594 Patent, Claim 3).  Reinman Decl., ¶¶ 51-53.  Additionally, dependent claims also disclose the capacity for a second delivery, teaching a server receiving a second acquisition request, electronically transferring to the customer communications device a second set of product images, and acquiring and delivering them.  '594 Patent, Claim 8; Reinman Decl., ¶¶ 51-53.  Finally, dependent claims also elaborate on the server's coordination with the GPS and imaging device of the mobile delivery agent system, disclosing the server providing the customer communications device the mobile delivery agent system's real-time street view, which was not a conventional, well-known use of either GPS or imaging devices at the time.  '594 Patent,

Claim 6; Reinman Decl., ¶¶ 51-53.  All of these limitation further demonstrate that the dependent claims are not abstract because they recited specific components and contain an inventive concept because they use these components in unconventional ways.  Reinman Decl., ¶¶ 51-53.

54.    In addition, there are no preemption concerns because, for example, Claim 13, discloses a specific, specialized system, with specific components, such as an MDAS and remote server, that improves upon Internet shopping and delivery by providing calculations based on locations of goods and the delivery site.  Reinman Decl., ¶ 50.  Claim 13 does not foreclose all methods of Internet shopping or even the delivery of goods because it uses these specialized components, in a specific way, as discussed above.  Reinman Decl., ¶ 50.

55.    All of the claims of the '594 Patent are not abstract and contain inventive concepts for the same reasons discussed above, although all of the claims have different scopes.  Reinman Decl., ¶ 50.

**The Claimed Inventions Are Not Analogous to Abstract Ideas**

56.    A POSITA would not have understood the claimed inventions, at the time of the invention, as applying conventional computer components to the business of traveling salespeople, personal assistants, or coordinating and monitoring baggage delivery.  Reinman Decl., ¶ 54.  Instead, Claim 1 of the '067 Patent is directed to a specialized mobile delivery agent system with real-time imaging and rapid delivery capability which converts an acquisition request received over the Internet to instructions for the MDAS and receives real-time communications from a customer based on an electronically transmitted image.  Reinman Decl., ¶ 54.  Claim 26 of the '835 Patent is directed to a specialized mobile agent system that includes software that permits a customer to inspect and approve the purchase of a particular

product exactly as shown in an electronically transmitted real-time image and providing delivery of the particular product to a delivery site.  Reinman Decl., ¶ 54.  Claim 11 of the '191 Patent is directed to a specialized mobile delivery agent system with a real-time video device that enables a user to view goods at a pick-up site and provide approval for the immediate purchase of goods and a selectable widget for a website to generate views of the goods at a pick-up site.  Reinman Decl., ¶ 54.  Claim 13 of the '594 Patent is directed to a specialized MDAS that uses a server which calculates and determines the most efficient delivery agent based on the location of goods, global positioning data, and delivery site, and uses a real-time video device to electronically transfer an image of a particular and causing delivery of that good.  Reinman Decl., ¶ 54.  The other claims of the '067 Patent, '191 Patent, '835 Patent, and '594 Patent are directed to similar systems, respectively, but vary based on the actual limitations of the claims.  Reinman Decl., ¶ 54.

## Prosecution History

57.     Claims of the '191 Patent, '067 Patent and '835 Patent issued following amendments during prosecution to overcome Section 101 rejections after the Supreme Court's *Alice* decision.

58.     During prosecution for the application that issued as the '067 Patent, the claims were amended to add the requirement to each of the independent claims that a remote server performs the steps of receiving a first acquisition request for goods, sending instructions based on the first acquisition request to a communication device of a mobile delivery agent system and deploying the mobile delivery agent system to a shopping location having the requested goods.  These amendments were made to overcome the prior office actions rejecting the pending claims, including on the basis that they were ineligible under Section 101.  In the

August 29, 2018 Notice of Allowance, the Examiner's Statement of Reasons for Allowance found certain claims were no longer "directed to a judicial exception … without significantly more" because they the claim amendments "substantively address[ed] and alleviat[ed] the previously expressed rationale" for finding the claims were not eligible.  The examiner allowed the '067 Patent to issue following these amendments which focused on the role of the server.

59.     The application that issued as the '191 Patent was filed on August 7, 2012, before the Supreme Court's 2014 *Alice* decision.  The prosecution, however, continued after the *Alice* decision, when the examiner issued a rejection based on the *Alice* framework in a September 19, 2014 office action.  In a later office action, the Examiner argued that "the claims as a whole are directed towards the remote acquisition and delivery of one or more goods which is considered to be a means for organizing human behavior."  Subsequently, the claims underwent significant amendments which the Examiner determined overcame these arguments, such that they were found patentable and allowable.  Indeed, in the August 17, 2015 Notice of Allowability for the '191 Patent, the examiner summarized an interview with the applicant regarding Section 101 as follows: "The independent claims were reivewed [sic] and language discussed for overcoming the [101] rejections of record. The Examiner and Applicant agreed to the language incorporated in the Examiner's Amendment of 8/6."  Thus, the claims of the '191 Patent that issued and are asserted here were amended according to the Examiner's suggested language for overcoming any alleged Section 101 issues and were allowable on that basis.

60.     Each of these '191 Patent amendments highlights the concrete requirements and emphasizes the unique role of each component of the system claimed in the '191 Patent, and that components of the system are utilized in unconventional ways to achieve the system's purpose.  For example, the proposed '191 Patent claims were amended to require that the

acquisition request from a customer be "through an interactive interface for processing the acquisition request" and "a global positioning system configured to provide location data to the at least one server; and a selectable widget for a website configured to retrieve data submitted by at least one of the mobile delivery agent systems to the at least one server and generate a view of the one or more goods at the pick-up site associated with a third party vendor together with at least the data submitted to the at least one server by the mobile delivery agent system." Additionally, the "communication means" of current independent Claim 11 was amended to "process[] the acquisition request from the customer" in addition to the existing claimed functionality for "establishing direct communication between the customer and the selected delivery agent during both the acquisition and delivery of the one or more goods to the customer." The amendment further required that at least one image be sent to the customer "through the communication means."

61.     The prosecution history of the '835 Patent spans more than eight years, culminating in a notice of allowance after an appeal and amendment to the claims pursuant to a Section 101 final rejection. In the February 26, 2020, Notice of Allowability for the '835 Patent, the Examiner stated that the applicant's amendments and arguments persuasively presented a practical application as required by Section 101, and thus allowed the claims to issue. In overcoming the Section 101 rejection, the applicant explained the amendments, in relevant part, as follows:

> Claims 11, 29 and [3]9 have been amended to specifically recite electronically transmitting, in real-time, information on the first set of one or more goods to the first customer using the digital image capture device of the agent, including obtaining an image of a particular product of the first set of the one or more goods and sending the image for the first customer to inspect and approve the purchase of the particular product exactly shown in the image; acquiring the particular product, via the agent; and providing for delivery of the particular product to a delivery site. It is respectfully submitted that this amendment specifically recites

additional elements that integrate the judicial exception into a practical application[.]

As explained in the specification, electronic commerce via the internet is rapidly becoming a standard method by which customers purchase goods remotely for delivery to a location of the customer's choice. However, there are many potential problems associated with ordering goods over the internet. For example, many customers are opposed to internet shopping. For instance, customers who are particular about style, quality or actual function, may wish to further view or otherwise examine an item before purchasing. Often, a picture may not be available for the item or the picture will be inadequate to accurately depict the item. For this reason, the customer may simply refuse to purchase over the internet or perhaps may purchase an item and then return the same after the item is later examined. Obviously, this purchasing scenario is also inefficient.

To overcome this problem the current invention requires that an image of the particular product being purchased be sent to the customer so that the customer may inspect and approve the purchase of that particular product exactly as shown in the image.

As Consumeron explained in 2019, this claim amendment "specifically recites additional elements that integrate the judicial exception into a practical application[.]" The examiner agreed, allowing the claims on that basis.

62.     Thus, the claims of the '191 Patent, '067 Patent and '835 Patent have been specifically amended to address Section 101 eligibility and allowed by the U.S. Patent and Trademark Office based on such amendments.

**CONSUMERON'S NOTICE OF INFRINGEMENT TO INSTACART**

63.     Consumeron contacted Instacart on or about March 21, 2018, regarding a potential license to Consumeron's patents, stating that the "letter constitutes written notification" of Instacart's "likely infringement" of at least the '594 and '191 Patents.  In addition, Instacart was given notice of its infringement of all of the Asserted Patents on August 6, 2021, when Consumeron filed its initial complaint against Instacart.  Dkt. No. 1.

## INSTACART'S SYSTEMS AND SERVICES

64.     Instacart makes, uses, sells, offers for sale, and/or imports into the United States and this District, systems, products and services.  Instacart operates a pick-up and delivery service of groceries and other items available in retail stores.  Instacart provides its pick-up and same-day delivery platform and service via mobile delivery agent system.  Instacart employs an extensive network of personal shoppers to fulfill orders from various retailers and deliver within hours in more than 5,500 cities and in all 50 states.  Instacart partners with over 350 retailers having more than 25,000 physical retail stores including Albertsons, Costco, CVS, Kroger, Petco, Publix, Safeway, Sam's Club, Sprouts Farmers Market, and Target Corporation. Instacart's retail pickup and delivery platform and service will be collectively referred to as the "Accused Systems and Services," which include Instacart's application and website, and Instacart's servers and software which are used to implement and operate the platform and service, and which are described in further detail below.

65.     Instacart develops and sells a mobile delivery agent system, which includes location information based on signals from global positioning devices and availability status on a network of delivery agents.  Then, Instacart provides same day delivery service through the use of the mobile delivery agent system.  The mobile delivery agent system includes a device that communicates with at least one remote server.  The mobile delivery agent system comprises real-time video devices, global positioning devices, and communication devices that interact with the remote server which utilizes Instacart's software (such as an application or website).



Exhibit 5, https://www.instacart.com/.

## **SHOPPING WITH INSTACART**

66.     Instacart's delivery system and service uses many different delivery agents for various locations.  As shown below, customers are able to use the application and/or website to create an order from a regional store.  The customer is able to request products to be added to their shopping cart.  Instacart is used to add items from retail stores like Albertsons, Costco, CVS, Kroger, Petco, Publix, Safeway, Sam's Club, Sprouts Farmers Market, and Target Corporation.



Exhibit 6a, https://play.google.com/store/apps/details?id=com.instacart.client.



https://youtu.be/PksAfCz6akw?t=78



Exhibit 6b, https://play.google.com/store/apps/details?id=com.instacart.client.

67.   Customers can use a website or download an application where Instacart connects to the Internet or network to receive customer data.  The Instacart user interface on the customer computer acquires the list of goods and service location.



https://youtu.be/PksAfCz6akw?t=9



https://youtu.be/PksAfCz6akw?t=14



https://youtu.be/PksAfCz6akw?t=31

68.     Instacart, after obtaining information from the shoppers, including location information based on the global positioning devices and availability status information, assigns the order to a shopper.  Instacart collects this information approximately every 10 seconds to route shoppers to complete the order.  Exhibit 7, https://tech.instacart.com/space-time-and-groceries-a315925acf3a; https://youtu.be/wGPq58nerCc?t=29.

69.     Instacart decides what orders each shopper should fulfill using a "fulfillment engine." Instacart then assigns the order to the shopper; the shopper receives a message directing them to which store location they need to go.  Exhibit 7, https://tech.instacart.com/space-time-and-groceries-a315925acf3a; https://youtu.be/wGPq58nerCc?t=58.

70.     Instacart then deploys a member of their fleet of shoppers to fulfill orders.  Full-service shoppers and in-store shopper handpick the items requested from available stores.

40

## Full-service shopper

Full-service shoppers are independent contractors that use the Instacart platform to shop and deliver orders for their customers. This opportunity has lots of flexibility—you choose which batches you'd like to shop, with no limit on how many batches you can fulfill.

Requirements to be on the platform as a full-service shopper include—

- 18 years of age or older
- Eligibility to work in the U.S. or Canada
- A smartphone with Android 5.0 or later, iOS 9 or later
- A functioning, registered vehicle
- Vehicle insurance, in accordance with local laws
- Can lift 30+ pounds
- Following Instacart's food safety policies

## In-store shopper

In-store shoppers are Instacart employees who, among other things, shop and stage orders in one store at a time. These part-time shoppers work scheduled shifts, up to 29 hours per week. No car is required for this role.

Requirements for the in-store shopper role include—

- 18 years of age or older
- Eligibility to work in the U.S. or Canada
- A smartphone with Android 5.0 or later, iOS 9 or later
- Can lift 30+ pounds
- Following Instacart's food safety policies

Individuals with a medical condition or disability may qualify for reasonable accommodations. Please fill out this form to contact us.

Exhibit 8, https://instacartonboarding.zendesk.com/hc/en-us/articles/360027154831-Shopper-roles.



https://youtu.be/PksAfCz6akw?t=103

## Available stores

Instacart Shoppers shop local stores in your area. To see which stores are available to you, visit **our locations page**. From there, select your state or scroll down to see a list of available areas. Selecting the area name displays a list of available stores in that area.

Exhibit 9, https://www.instacart.com/help/section/360007797972/360039569711.

71.     As shown below, the Instacart shopper is directed to the store to acquire the customer requested goods.

At it's simplest, our logistics problem can be viewed as solving a TSP (traveling salesman problem) where the shopper must go to the store first. For example, the shopper drives to the store, picks your groceries (along with two other orders), and then delivers them in a sequence:



Exhibit 7, https://tech.instacart.com/space-time-and-groceries-a315925acf3a.

72.     At the store, the Instacart shopper acquires the items that the customer requested.  Instacart employs a real-time video device, which is configured to send one or more images in real-time to the customer of goods.



Exhibit 6b, https://play.google.com/store/apps/details?id=com.instacart.client.



https://youtu.be/wGPq58nerCc?t=81



Exhibit 10, https://www.vox.com/the-goods/2019/5/14/18566237/instacart-shopper-tip-grocery-delivery-payment.



https://www.youtube.com/watch?v=339hDS2NHX4

73.     Instacart electronically transmits information of one or more goods using a digital image device to capture images of a particular product of the first set of the one or more goods and sending the image for the customer to approve and purchase particular products in the image.



https://www.youtube.com/watch?v=339hDS2NHX4

74.     Instacart uses a selectable widget for a website configured to retrieve status-of the-order data submitted by at least one of the mobile delivery agent systems to the at least one server and generate a view of the status-of the-order of the one or more goods.



Exhibit 11, https://www.instacart.com/help/section/360007902851/360039162832.



Exhibit 11, https://www.instacart.com/help/section/360007902851/360039162832.

75.     After acquiring the customer's specific items, the agent delivers the order to the customer designated location.

At it's simplest, our logistics problem can be viewed as solving a TSP (traveling salesman problem) where the shopper must go to the store first. For example, the shopper drives to the store, picks your groceries (along with two other orders), and then delivers them in a sequence:



Exhibit 7, https://tech.instacart.com/space-time-and-groceries-a315925acf3a.



https://youtu.be/PksAfCz6akw?t=105

## <u>INSTACART'S INFRINGEMENT OF THE PATENTS</u>

76.     Instacart has been and is now infringing, and will continue to infringe, the Asserted Patents in this District and elsewhere in the United States by, among other things, making, using, importing, selling, and/or offering for sale its Accused Systems and Services.

77.     In addition to directly infringing the Asserted Patents pursuant to 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, or both, Instacart also indirectly infringes the '067 Patent, '191 Patent, '835 Patent, and '594 Patent pursuant to 35 U.S.C. § 271(b) and (c), by instructing, directing, and/or requiring others, including their customers, purchasers, shoppers, users, and developers, to use or perform all or some of the steps of the system and method claims, either literally or under the doctrine of equivalents, or both, of the '067 Patent, '191 Patent, '835 Patent, and '594 Patent.  Instacart contributorily infringes the Asserted Patents by making and supplying the Instacart application and supporting servers and software that are components in an infringing system with components from manufacturers, customers, purchasers, shoppers, users, and developers that together meet all claim elements in the Asserted Patents, literally and/or under the doctrine of equivalents.

78.     Consumeron is informed and believes that Instacart was aware of the Asserted Patents, and has done nothing to curtail its infringement.

79.     Consumeron is informed and believes that despite Instacart's knowledge of the Asserted Patents and Consumeron's patented technology, Instacart made the deliberate decision to make, use, sell and offer for sell systems and services that it knew infringes the Asserted Patents.

80.     Consumeron is informed and believes that Instacart has undertaken no efforts to avoid infringement of the Asserted Patents, despite Instacart's knowledge and understanding

that Instacart's systems and services infringe these patents.

81.     Consumeron is informed and believes that Instacart knew or was willfully blind to Consumeron's patented technology.  Despite this knowledge and/or willful blindness, Instacart has acted with disregard for Consumeron's patent rights with an objectively high likelihood of infringement.

82.     Instacart, on information and belief, knowing of Consumeron's Asserted Patents encouraged, by instructing, directing, and/or requiring others, including their customers, purchasers, shoppers, users, and developers, to use or perform all or some of the steps of the system and method claims, either literally or under the doctrine of equivalents, or both, of the '067 Patent, '191 Patent, '835 Patent, and '594 Patent.

83.     Consumeron is informed and believes that Instacart specifically intended to induce, including their customers, purchasers, shoppers, users, and developers, to use or perform all or some of the steps of the system and method claims of the Asserted Patents.

<u>**COUNT I**</u>
**(Direct Infringement of the '594 Patent)**

84.     Consumeron repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

85.     Instacart has infringed and continues to infringe Claims 1 and 13 and at least one dependent claim of the '594 Patent in violation of 35 U.S.C. § 271(a).

86.     Instacart's infringement is based upon literal infringement or infringement under the doctrine of equivalents, or both.

87.     Instacart's acts of making, using, importing, selling, and/or offering for sale infringing systems and services have been without the permission, consent, authorization, or license of Consumeron.

88.    Instacart's infringement includes, but is not limited to, the manufacture, use, sale, importation and/or offer for sale of Instacart's systems and services, including the Instacart application, Instacart webpage, Instacart delivery services, and Instacart's servers and software which are used to implement and operate the platform and services (the "'594 Accused Systems and Services").

89.    The '594 Accused Systems and Services infringe the '594 Patent because they perform a method for remote acquisition and delivery of goods comprising: deploying a plurality of delivery agents of a service provider to various geographic locations, each delivery agent having a mobile delivery agent system in communication with at least one remote server, wherein each mobile delivery agent system includes: a real-time video device, a global positioning device, and a communication device; receiving a first acquisition request from a first customer for a set of one or more goods; obtaining information, including location information based on signals from the global positioning devices and availability status information, on the plurality of delivery agents: obtaining a selection of one of the plurality of delivery agents for fulfilling the first acquisition request; deploying one of the plurality of delivery agents to a location having the first set of one or more goods; electronically transferring an image of the first set of one or more goods to the first customer using the real-time video device; acquiring the first set of one or more goods via the delivery agent; and delivering the first set of one or more goods to a delivery site selected by the first customer.

90.    For example, the '594 Accused Systems and Services perform a method of remote acquisition and delivery of goods where full-service and in-store shoppers are sent to various locations to shop using a mobile delivery agent system comprised of a "smartphone with Android 5.0 or later, iOS 9 or later" that includes a real-time video device, a global

positioning device, and a communication device with a connection to a remote server.

### Full-service shopper

Full-service shoppers are independent contractors that use the Instacart platform to shop and deliver orders for their customers. This opportunity has lots of flexibility—you choose which batches you'd like to shop, with no limit on how many batches you can fulfill.

Requirements to be on the platform as a full-service shopper include—

- 18 years of age or older
- Eligibility to work in the U.S. or Canada
- A smartphone with Android 5.0 or later, iOS 9 or later
- A functioning, registered vehicle
- Vehicle insurance, in accordance with local laws
- Can lift 30+ pounds
- Following Instacart's food safety policies

### In-store shopper

In-store shoppers are Instacart employees who, among other things, shop and stage orders in one store at a time. These part-time shoppers work scheduled shifts, up to 29 hours per week. No car is required for this role.

Requirements for the in-store shopper role include—

- 18 years of age or older
- Eligibility to work in the U.S. or Canada
- A smartphone with Android 5.0 or later, iOS 9 or later
- Can lift 30+ pounds
- Following Instacart's food safety policies

Individuals with a medical condition or disability may qualify for reasonable accommodations. Please fill out this form to contact us.

Exhibit 8, https://instacartonboarding.zendesk.com/hc/en-us/articles/360027154831-Shopper-roles.

## Available stores

Instacart Shoppers shop local stores in your area. To see which stores are available to you, visit **our locations page**. From there, select your state or scroll down to see a list of available areas. Selecting the area name displays a list of available stores in that area.

Exhibit 9, https://www.instacart.com/help/section/360007797972/360039569711.

91.    Instacart, as an example, receives a shopping request from a customer for one or

53

more goods.



Exhibit 6a, https://play.google.com/store/apps/details?id=com.instacart.client.



https://youtu.be/PksAfCz6akw?t=78

92.     Further, as an example, Instacart, through its platform utilizing its servers and associated software, is obtaining information, including location information based on signals from the global positioning devices and availability status information, on the plurality of delivery agents.  Exhibit 7, https://tech.instacart.com/space-time-and-groceries-a315925acf3a.

93.     The '594 Accused Systems and Services assign and route shoppers using GPS location data updated about every 10 seconds.  As an example, some information Instacart collects is the timestamp, latitude and longitude, speed, direction and accuracy reported by the device.  Exhibit 7, https://tech.instacart.com/space-time-and-groceries-a315925acf3a.

94.     As shown below, Instacart, through its platform utilizing its servers and associated software, deploys one of the shoppers to a location that has the goods requested by the customer.

At it's simplest, our logistics problem can be viewed as solving a TSP (<u>traveling salesman problem</u>) where the shopper must go to the store first. For example, the shopper drives to the store, picks your groceries (along with two other orders), and then delivers them in a sequence:



Exhibit 7, https://tech.instacart.com/space-time-and-groceries-a315925acf3a.

95.     As another example, Instacart electronically transfers, through its platform utilizing its servers and associated software, an image of the first set of one or more goods to the customer using the real-time video device.







https://www.youtube.com/watch?v=339hDS2NHX4

96.     As shown in below, Instacart shoppers acquire the first set of one or more goods via the delivery agent.



https://youtu.be/wGPq58nerCc?t=81

97.     Further shown, Instacart's shopper handpicks the customer's items and delivers the customer's goods to a customer designated location.



Exhibit 12, https://www.bizjournals.com/sanantonio/news/2020/08/19/instacart-eliminates-in-store-shoppers-at-h-e-b.html.



https://youtu.be/PksAfCz6akw?t=105

At it's simplest, our logistics problem can be viewed as solving a TSP (traveling salesman problem) where the shopper must go to the store first. For example, the shopper drives to the store, picks your groceries (along with two other orders), and then delivers them in a sequence:



Exhibit 7, https://tech.instacart.com/space-time-and-groceries-a315925acf3a.

98.     Further, as an example, Instacart employs a logistics system, through its platform utilizing its servers and associated software, for choosing a retailer where after receiving the customer request the '594 Accused Systems and Services calculate which of the shoppers could most efficiently carry out the request.  The calculation uses at least one remote server, with the calculation being based, at least in part, on a location having the first set one or more goods, a current location of the delivery agent as determined utilizing the global positioning device, and the delivery site.  The '594 Accused Systems and Services deploy one of the shoppers to the location, using at least in part the above calculation.  Exhibit 7, https://tech.instacart.com/space-time-and-groceries-a315925acf3a.

99.     Instacart's infringement of the '594 Patent has injured and continues to injure Consumeron in an amount to be proven at trial, but not less than a reasonable royalty.

100.    On information and belief, Instacart is aware of Consumeron's patent portfolio,

including the '594 Patent.  On information and belief, Instacart has known of and possessed

information regarding the Asserted Patents.  On or about March 21, 2018, Consumeron

informed Instacart of its patent portfolio, including the '594 Patent and Instacart's infringement

thereof.

101.    Instacart's infringement has caused and is continuing to cause damage and

irreparable injury to Consumeron and Consumeron will continue to suffer damage and

irreparable injury unless and until that infringement is enjoined by this Court.

102.    Consumeron is entitled to injunctive relief, damages and any other relief in

accordance with 35 U.S.C. §§ 283, 284 and 285.

## COUNT II
### (Indirect Infringement of the '594 Patent)

103.    Consumeron repeats, realleges, and incorporates by reference, as if fully set

forth herein, the allegations of the preceding paragraphs, as set forth above.

104.    Instacart has induced and continues to induce infringement of one or more

claims of the '594 Patent under 35 U.S.C. § 271(b). Instacart has contributorily infringed and

continues to contributorily infringe of one or more claims of the '594 Patent under 35 U.S.C.

§ 271(c).

105.    In addition to directly infringing the '594 Patent, Instacart indirectly infringes

the '594 Patent pursuant to 35 U.S.C. § 271(b) by instructing, directing and/or requiring others,

including customers, purchasers, shoppers, users and developers, to perform one or more of the

steps of the method claims, either literally or under the doctrine of equivalents, of the '594

Patent, where all the steps of the method claims are performed by either Instacart, its

customers, purchasers, shoppers, users, and developers, or some combination thereof.  Instacart

knew or was willfully blind to the fact that it was inducing others, including customers,

purchasers, shoppers, users, and developers, to infringe by practicing, either themselves or in conjunction with Instacart, one or more method claims of the '594 Patent, including at least Claims 1 and 13.

106.    Instacart knowingly and actively aided and abetted the direct infringement of the '594 Patent by instructing and encouraging its customers, purchasers, shoppers, users, and developers to use the '594 Accused Systems and Services.  Such instructions and encouragement include, but is not limited to, advising third parties to use the '594 Accused Systems and Services in an infringing manner, providing a mechanism through which third parties may infringe the '594 Patent, and by advertising and promoting the use of the '594 Accused Systems and Services in an infringing manner, and distributing guidelines and instructions to third parties on how to use the '594 Accused Systems and Services in an infringing manner.  Further examples of this instruction and encouragement include, for example, trainings by Instacart either in-person or by instructional videos and material, for its full-service and in-store shoppers as to how to utilize the Instacart application of the mobile delivery agent system, and how to acquire and deliver a set of one or more goods as requested by customers utilizing the Instacart application or Instacart website.

107.    Instacart updates and maintains help and customer service sections on its website which cover in-depth aspects of operating the Accused Systems and Services in an infringing manner.  Further, Instacart advertises on its website the Accused Systems and Services infringing features and instructs consumers on how to configure and use the Accused Systems and Services in an infringing manner.  *See, e.g.*, Exhibit 13, https://www.instacart.com/help.

108.    Instacart contributorily infringes the '594 Patent pursuant to 35 U.S.C. § 271(c)

because it has provided material components of claims of the '594 Patent.  In particular, Instacart knows that its systems and Instacart application are particularly suited to be used in an infringing manner and are particularly suited for this use.  The '594 Accused Systems and Services include the Instacart application and supporting servers and software, which are developed and specialized for remote acquisition and delivery of goods, and are not staple articles or commodities of commerce because they are specifically made to be used in an infringing manner, as described in the direct infringement claim above.  Instacart has known or has been willfully blind to the fact that it is contributing to the infringement of one or more claims of the '594 Patent, including at least Claims 1 and 13.

109.    Instacart has knowingly and actively contributed to the direct infringement of the '594 Patent by its manufacture, use, offer to sell, sale and importation of the '594 Accused Systems and Services together with its manufacturers, customers, purchasers, shoppers, users, developers, and/or vendors to meet the elements of the '594 Patent, as described above and incorporated by reference here.  Furthermore, Instacart's customers, purchasers, shoppers, users, developers, vendors, and/or manufacturers also directly infringe these claims jointly with Instacart, to the extent specific components are provided by those third parties.  To the extent Instacart's customers, purchasers, shoppers, users, developers, vendors, and/or manufacturers direct and control the methods in the claims, Instacart obtains benefits from the control of the system as a whole.  Instacart requires its customers, purchasers, shoppers, users, developers, vendors, and/or manufacturers to put the methods described in the claims into service to obtain the benefit of Instacart's services.

110.    Instacart's indirect infringement of the '594 Patent has injured and continues to injure Consumeron in an amount to be proven at trial, but not less than a reasonable royalty.

111.    Instacart's infringement has caused and is continuing to cause damage and irreparable injury to Consumeron, and Consumeron will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

112.    Consumeron is entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284 and 285.

## COUNT III
### (Direct Infringement of the '191 Patent)

113.    Consumeron repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

114.    Instacart has infringed and continue to infringe at least Claims 1, 11, 14 and at least one dependent claim of the '191 Patent in violation of 35 U.S.C. § 271(a).

115.    Instacart's infringement is based upon literal infringement or infringement under the doctrine of equivalents, or both.

116.    Instacart's acts of making, using, importing, selling, and/or offering for sale infringing systems and services have been without the permission, consent, authorization, or license of Consumeron.

117.    Instacart's infringement includes, but is not limited to, the manufacture, use, sale, importation and/or offer for sale of Instacart's systems and services, including the Instacart application, Instacart webpage, Instacart delivery services, and Instacart's servers and software which are used to implement and operate the platform and services (the "'191 Accused Systems and Services").

118.    The '191 Accused Systems and Services infringe the '191 Patent because they have a system for remote acquisition and delivery of one or more goods based on an acquisition request from a customer through an interactive interface for processing the

acquisition request comprising: a customer computer having a user interface; at least one server in communication with a wide area network; a plurality of mobile delivery agent systems in communication with the at least one server, each of the plurality of delivery agent systems being configured for use with a respective purchasing and delivery agent for a shopping event and including: a real-time video device configured to send one or more images in real-time to the customer from the respective agent, wherein the real-time video device is con figured to enable the customer to be provided with progress information via real-time imaging of the one or more images from the respective agent through the customer computer during performance of the acquisition request, including viewing the one or more goods from a pick-up site for the one or more goods; a communications device configured to establish direct communication between the customer and the respective agent to enable the customer to provide a communicated approval for the agent to immediately purchase the one or more goods viewed by the customer in connection with completing the acquisition request: a global positioning system configured to provide location data to the at least one server; and a selectable widget for a website configured to retrieve data submitted by at least one of the mobile delivery agent systems to the at least one server and generate a view of the one or more goods at the pick-up site associated with a third party vendor together with at least the data submitted to the at least one server by the mobile delivery agent system.

119.    For example, the '191 Accused Systems and Services includes a customer computer having a user interface, where there is communication with a wide area network, a user interface and/or configured to establish a local communication link between the customer and a mobile agent for purposes of the acquisition request:



https://youtu.be/PksAfCz6akw?t=9



https://youtu.be/PksAfCz6akw?t=14

120. As another example, the '191 Accused Systems and Services perform a method of remote acquisition and delivery of goods where full-service and in-store shoppers are sent to various locations to shop using a mobile delivery agent system comprised of a "smartphone with Android 5.0 or later, iOS 9 or later" that includes a real-time video device, a global positioning device, and a communication device with a connection to a remote server. https://youtu.be/wGPq58nerCc?t=29.

**Full-service shopper**

Full-service shoppers are independent contractors that use the Instacart platform to shop and deliver orders for their customers. This opportunity has lots of flexibility—you choose which batches you'd like to shop, with no limit on how many batches you can fulfill.

Requirements to be on the platform as a full-service shopper include—

- 18 years of age or older
- Eligibility to work in the U.S. or Canada
- A smartphone with Android 5.0 or later, iOS 9 or later
- A functioning, registered vehicle
- Vehicle insurance, in accordance with local laws
- Can lift 30+ pounds
- Following Instacart's food safety policies

**In-store shopper**

In-store shoppers are Instacart employees who, among other things, shop and stage orders in one store at a time. These part-time shoppers work scheduled shifts, up to 29 hours per week. No car is required for this role.

Requirements for the in-store shopper role include—

- 18 years of age or older
- Eligibility to work in the U.S. or Canada
- A smartphone with Android 5.0 or later, iOS 9 or later
- Can lift 30+ pounds
- Following Instacart's food safety policies

Individuals with a medical condition or disability may qualify for reasonable accommodations. Please fill out this form to contact us.

Exhibit 8, https://instacartonboarding.zendesk.com/hc/en-us/articles/360027154831-Shopper-roles.

## Available stores

Instacart Shoppers shop local stores in your area. To see which stores are available to you, visit **our locations page**. From there, select your state or scroll down to see a list of available areas. Selecting the area name displays a list of available stores in that area.

Exhibit 9, https://www.instacart.com/help/section/360007797972/360039569711.

121.    As an example, while at the store the Instacart shopper uses a communications device of the smartphone configured to establish direct communication between the customer and the shopper to enable the customer to provide a communicated approval for the agent to

67

immediately purchase one or more goods viewed by the customer in connection with completing the request.



https://www.youtube.com/watch?v=339hDS2NHX4

122.    As an example, Instacart employs a global positioning system of the smartphone configured to provide location data to at least a server.  Exhibit 7,

https://tech.instacart.com/space-time-and-groceries-a315925acf3a.

123.    Further, Instacart uses a selectable widget for a website configured to retrieve status-of the-order data submitted by at least one of the mobile delivery agent systems to the at least one server and generate a view of the status-of the-order of the one or more goods at pick-up site associated with a third party vendor together with at least the data submitted to the at least one server by the mobile delivery agent system.



Exhibit 11, https://www.instacart.com/help/section/360007902851/360039162832.

124.    As an example shown below, Instacart employs a system for remote acquisition and delivery of one or more goods based on an acquisition request from a customer through an interactive interface for processing the acquisition request where Instacart employs a customer computer having a user interface and configured to establish a local communication link between the customer and a mobile agent for purposes of the acquisition request.

125.    Instacart's infringement of the '191 Patent has injured and continues to injure Consumeron in an amount to be proven at trial, but not less than a reasonable royalty.

126.    On information and belief, Instacart is aware of Consumeron's patent portfolio, including the '191 Patent.  On information and belief, Instacart has known of and possessed information regarding the Asserted Patents.  On or about March 21, 2018, Consumeron

informed Instacart of its patent portfolio, including the '191 Patent and Instacart's infringement thereof.

127.    Instacart's infringement has caused and is continuing to cause damage and irreparable injury to Consumeron and Consumeron continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

128.    Consumeron is entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284 and 285.

## COUNT IV
### (Indirect Infringement of the '191 Patent)

129.    Consumeron repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

130.    Instacart has and continues to induce infringement of one or more claims of the '191 Patent under 35 U.S.C. § 271(b). Instacart has contributorily infringed and continues to contributorily infringe of one or more claims of the '191 Patent under 35 U.S.C. § 271(c).

131.    In addition to directly infringing the '191 Patent, Instacart indirectly infringes the '191 Patent pursuant to 35 U.S.C. § 271(b) by instructing, directing and/or requiring others, including customers, purchasers, shoppers, users and developers, to, for example, use the patented systems, of the '191 Patent.  Instacart knew or was willfully blind to the fact that it was inducing others, including customers, purchasers, shoppers, users, and developers, to infringe by using, either themselves or in conjunction with Instacart, the patented systems of the '191 Patent, including at least Claims 1 and 14.

132.    Instacart knowingly and actively aided and abetted the direct infringement of the '191 Patent by instructing and encouraging its customers, purchasers, shoppers, users, and developers to use the '191 Accused Systems and Services.  Such instructions and

encouragement include, but is not limited to, advising third parties to use the '191 Accused Systems and Services in an infringing manner, providing a mechanism through which third parties may infringe the '191 Patent, and by advertising and promoting the use of the '191 Accused Systems and Services in an infringing manner, and distributing guidelines and instructions to third parties on how to use the '191 Accused Systems and Services in an infringing manner.  This instruction and encouragement includes, for example, encouraging customers to download the Instacart application to their Android or Apple devices or to access the Instacart website from their computers to utilize Instacart's pickup and delivery service. Further examples of this instruction and encouragement include, for example, trainings by Instacart either in-person or by instructional videos and material, for its full-service and in-store shoppers as to how to utilize the Instacart application of the mobile delivery agent system, and how to acquire and deliver a set of one or more goods as requested by customers utilizing the Instacart application or Instacart website.

133.    Instacart updates and maintains help and customer service sections on its website which cover in-depth aspects of operating the Accused Systems and Services in an infringing manner.  Further, Instacart advertises on its website the Accused Systems and Services infringing features and instructs consumers on how to configure and use the Accused Systems and Services in an infringing manner.  *See, e.g.*, Exhibit 13, https://www.instacart.com/help.

134.    Instacart contributorily infringes the '191 Patent pursuant to 35 U.S.C. § 271(c) because it has provided material components of claims of the '191 Patent.  In particular, Instacart knows that its systems and Instacart application are particularly suited to be used in an infringing manner and are particularly suited for this use.  The '191 Accused Systems and

Services include the Instacart application and supporting servers and software, which are developed and specialized for remote acquisition and delivery of goods, and are not staple articles or commodities of commerce because they are specifically made to be used in an infringing manner, as described in the direct infringement claim above.  Instacart has known or has been willfully blind to the fact that it is contributing to the infringement of one or more claims of the '191 Patent, including Claims 1 and 14.

135.    Instacart has knowingly and actively contributed to the direct infringement of the '191 Patent by its manufacture, use, offer to sell, sale and importation of the '191 Accused Systems and Services together with its manufacturers, customers, purchasers, shoppers, users, developers, and/or vendors to meet the elements of the '191 Patent, as described above and incorporated by reference here.  Furthermore, Instacart's customers, purchasers, shoppers, users, developers, vendors, and/or manufacturers also directly infringe these claims jointly with Instacart, to the extent specific components are provided by those third parties.  To the extent Instacart's customers, purchasers, shoppers, users, developers, vendors, and/or manufacturers direct and control the systems and methods in the claims, Instacart obtains benefits from the control of the system as a whole.  Instacart requires its customers, purchasers, shoppers, users, developers, vendors, and/or manufacturers to put the methods described in the claims into service to obtain the benefit of Instacart's services.

136.    Instacart's indirect infringement of the '191 Patent has injured and continues to injure Consumeron in an amount to be proven at trial, but not less than a reasonable royalty.

137.    Instacart's infringement has caused and is continuing to cause damage and irreparable injury to Consumeron, and Consumeron will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

138.     Consumeron is entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284 and 285.

## COUNT V
### (Direct Infringement of the '067 Patent)

139.     Consumeron repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

140.     Instacart has infringed and continue to infringe Claims 1, 27 and 28 and at least one dependent claim of the '067 Patent in violation of 35 U.S.C. § 271(a).

141.     Instacart's infringement is based upon literal infringement or infringement under the doctrine of equivalents, or both.

142.     Instacart's acts of making, using, importing, selling, and/or offering for sale infringing systems and services have been without the permission, consent, authorization, or license of Consumeron.

143.     Instacart's infringement includes, but is not limited to, the manufacture, use, sale, importation and/or offer for sale of Instacart's systems and services, including the Instacart application, Instacart webpage, Instacart delivery services, and Instacart's servers and software which are used to implement and operate the platform and services (the "'067 Accused Systems and Services").

144.     The '067 Accused Systems and Services infringe the '067 Patent because they perform a method for remote acquisition and delivery of goods comprising: at least one remote server receiving, through the internet or a network from a user interface on a customer computer at a first location, a first acquisition request from a first customer for a first set of one or more goods, at a second, service location; the at least one remote server sending instructions based on the first acquisition request, to a communication device of a mobile delivery agent

73

system located at a third location; the at least one remote server deploying the mobile delivery agent system from the third location to a fourth, shopping location, having the first set of one or more goods, by providing instructions to the communication device, wherein the mobile delivery agent system includes: an image capture device and the communication device; obtaining an image, with the mobile delivery agent system through use of the image capture device, of the first set of one or more goods at the shopping location; electronically transmitting, with the mobile delivery agent system through use of the communication device, the image of the first set of one or more goods from the shopping location to the customer computer of the first customer; receiving, with the communication device of the mobile delivery agent system, further instructions from the first customer, through the customer computer, about the first set of one or more goods based on the transmitted image; acquiring the first set of one or more goods at the shopping location via the mobile delivery agent system; and delivering the first set of one or more goods from the shopping location to a delivery site.

145.    The '067 Accused Systems and Services perform a method for remote acquisition and delivery of goods.

146.    As shown below, the '067 Accused Systems and Services receive a customer's order of one or more goods through an application from which the Instacart customer can request a set of goods/items to be acquired by placing an order from a first location to a server configured to receive the order at a second location.



Exhibit 5, https://www.instacart.com/.



https://youtu.be/PksAfCz6akw?t=9



https://youtu.be/PksAfCz6akw?t=14



https://youtu.be/PksAfCz6akw?t=31

147.    In an example, shown below, at least one remote server of Instacart sends instructions based on the first request, to the smartphone or device of the shopper comprising a "smartphone with Android 5.0 or later or iOS 9.0 or later" located at a different location.

At it's simplest, our logistics problem can be viewed as solving a TSP (<u>traveling salesman problem</u>) where the shopper must go to the store first. For example, the shopper drives to the store, picks your groceries (along with two other orders), and then delivers them in a sequence:



Exhibit 7, https://tech.instacart.com/space-time-and-groceries-a315925acf3a.

### Full-service shopper

Full-service shoppers are independent contractors that use the Instacart platform to shop and deliver orders for their customers. This opportunity has lots of flexibility—you choose which batches you'd like to shop, with no limit on how many batches you can fulfill.

Requirements to be on the platform as a full-service shopper include—

- 18 years of age or older
- Eligibility to work in the U.S. or Canada
- A smartphone with Android 5.0 or later, iOS 9 or later
- A functioning, registered vehicle
- Vehicle insurance, in accordance with local laws
- Can lift 30+ pounds
- Following Instacart's food safety policies

### In-store shopper

In-store shoppers are Instacart employees who, among other things, shop and stage orders in one store at a time. These part-time shoppers work scheduled shifts, up to 29 hours per week. No car is required for this role.

Requirements for the in-store shopper role include—

- 18 years of age or older
- Eligibility to work in the U.S. or Canada
- A smartphone with Android 5.0 or later, iOS 9 or later
- Can lift 30+ pounds
- Following Instacart's food safety policies

Individuals with a medical condition or disability may qualify for reasonable accommodations. Please fill out this form to contact us.

Exhibit 8, https://instacartonboarding.zendesk.com/hc/en-us/articles/360027154831-Shopper-roles.

148.    Further infringement is exemplified by '067 Accused Systems and Services using at least one remote server of Instacart and deploying the mobile delivery agent system from the third location to a fourth, shopping location, having the first set of one or more goods, by providing instructions to the communication device, where the mobile delivery agent system in the smartphone includes at least an image capture device and the communication device.  Exhibit 7, https://tech.instacart.com/space-time-and-groceries-a315925acf3a.

149.    As an example, Instacart obtains an image, with the mobile delivery agent system through use of the image capture device of the customer goods at the shopping location. Instacart electronically transmits the image of the goods, using the communication device,

from the shopping location to the customer device.







https://www.youtube.com/watch?v=339hDS2NHX4

150.    As shown below, Instacart acquires the goods at the shopping location via the mobile delivery agent system.



https://youtu.be/wGPq58nerCc?t=81



https://youtu.be/PksAfCz6akw?t=105

151.    Instacart's infringement of the '067 Patent has injured and continues to injure Consumeron in an amount to be proven at trial, but not less than a reasonable royalty.

152.    On information and belief, Instacart is aware of Consumeron's patent portfolio, including the '067 Patent.  On information and belief, Instacart has known of and possessed information regarding the Asserted Patents.  On or about March 21, 2018, Consumeron informed Instacart of its patent portfolio and Instacart's infringement thereof.

153.    Instacart's infringement has caused and is continuing to cause damage and irreparable injury to Consumeron and Consumeron continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

154.    Consumeron is entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284 and 285.

## COUNT VI
### (Indirect Infringement of the '067 Patent)

155.     Consumeron repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

156.     Instacart has induced and continues to induce infringement of one or more claims of the '067 Patent under 35 U.S.C. § 271(b). Instacart has contributorily infringed and continues to contributorily infringe of one or more claims of the '067 Patent under 35 U.S.C. § 271(c).

157.     In addition to directly infringing the '067 Patent, Instacart indirectly infringes the '191 Patent pursuant to 35 U.S.C. § 271(b) by instructing, directing and/or requiring others, including customers, purchasers, shoppers, users and developers, to perform one or more of the steps of the method claims, either literally or under the doctrine of equivalents, of the '067 Patent, where all the steps of the method claims are performed by either Instacart, its customers, purchasers, shoppers, users, and developers, or some combination thereof.  Instacart knew or was willfully blind to the fact that it was inducing others, including customers, purchasers, shoppers, users, and developers, to infringe by practicing, either themselves or in conjunction with Instacart, one or more method claims of the '067 Patent, including at least Claims 1, 27 and 28.

158.     Instacart knowingly and actively aided and abetted the direct infringement of the '067 Patent by instructing and encouraging its customers, purchasers, shoppers, users, and developers to use the '067 Accused Systems and Services.  Such instructions and encouragement include, but is not limited to, advising third parties to use the '067 Accused Systems and Services in an infringing manner, providing a mechanism through which third parties may infringe the '067 Patent, and by advertising and promoting the use of the '067

Accused Systems and Services in an infringing manner, and distributing guidelines and instructions to third parties on how to use the '067 Accused Systems and Services in an infringing manner. Further examples of this instruction and encouragement include, for example, trainings by Instacart either in-person or by instructional videos and material, for its full-service and in-store shoppers as to how to utilize the Instacart application of the mobile delivery agent system, and how to acquire and deliver a set of one or more goods as requested by customers utilizing the Instacart application or Instacart website.

159.    Instacart updates and maintains help and customer service sections on its website, which cover in-depth aspects of operating the Accused Systems and Services in an infringing manner. Further, Instacart advertises on its website the Accused Systems and Services infringing features and instructs consumers on how to configure and use the Accused Systems and Services in an infringing manner. *See, e.g.*, Exhibit 13, https://www.instacart.com/help.

160.    Instacart contributorily infringes the '067 Patent pursuant to 35 U.S.C. § 271(c) because it has provided material components of claims of the '067 Patent. In particular, Instacart knows that its systems and Instacart application are particularly suited to be used in an infringing manner and are particularly suited for this use. The '067 Accused Systems and Services include the Instacart application and supporting servers and software, which are developed and specialized for remote acquisition and delivery of goods, and are not staple articles or commodities of commerce because they are specifically made to be used in an infringing manner, as described in the direct infringement claim above. Instacart has known or has been willfully blind to the fact that it is contributing to the infringement of one or more claims of the '067 Patent, including at least Claims 1, 27 and 28.

161.    Instacart has knowingly and actively contributed to the direct infringement of the '067 Patent by its manufacture, use, offer to sell, sale and importation of the '067 Accused Systems and Services together with its manufacturers, customers, purchasers, shoppers, users, developers, and/or vendors to meet the elements of the '067 Patent, as described above and incorporated by reference here.  Furthermore, Instacart's customers, purchasers, shoppers, users, developers, vendors, and/or manufacturers also directly infringe these claims jointly with Instacart, to the extent specific components are provided by those third parties.  To the extent Instacart's customers, purchasers, shoppers, users, developers, vendors, and/or manufacturers direct and control the methods in the claims; Instacart obtains benefits from the control of the system as a whole.  Instacart requires its customers, purchasers, shoppers, users, developers, vendors, and/or manufacturers to put the methods described in the claims into service to obtain the benefit of Instacart's services.

162.    Instacart's indirect infringement of the '067 Patent has injured and continues to injure Consumeron in an amount to be proven at trial, but not less than a reasonable royalty.

163.    Instacart's infringement has caused and is continuing to cause damage and irreparable injury to Consumeron, and Consumeron will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

164.    Consumeron is entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284 and 285.

## <u>COUNT VII</u>
### (Direct Infringement of the '835 Patent)

165.    Consumeron repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

166.    Instacart has infringed and continue to infringe Claims 1, 24 and 26 and at least

one dependent claim of the '835 Patent in violation of 35 U.S.C. § 271(a).

167.    Instacart's infringement is based upon literal infringement or infringement under the doctrine of equivalents, or both.

168.    Instacart's acts of making, using, importing, selling, and/or offering for sale infringing systems and services have been without the permission, consent, authorization, or license of Consumeron.

169.    Instacart's infringement includes, but is not limited to, the manufacture, use, sale, importation and/or offer for sale of Instacart's systems and services, including the Instacart application, Instacart webpage, Instacart delivery services, and Instacart's servers and software which are used to implement and operate the platform and services (the "'835 Accused Systems and Services").

170.    The '835 Accused Systems and Services infringe the '835 Patent because they have a method for remote acquisition and delivery of goods comprising: locating a plurality of agents of a service provider at various geographic locations, each agent having a mobile agent system in communication with at least one remote server, wherein each mobile agent system includes: a digital image capture device and a communication device; receiving through the at least one remote server a first acquisition request from a first customer for a first set of one or more goods, including receiving product data from the first customer regarding at least one of the one or more goods; contacting through the communications device one of the plurality of agents for a location having the first set of one or more goods; electronically transmitting, in real-time, information on the first set of one or more goods to the first customer using the digital image capture device of the agent, including obtaining an image of a particular product of the first set of the one or more goods and sending the image for the first customer to inspect

and approve the purchase of the particular product exactly shown in the image; acquiring the

particular product, via the agent; and providing for delivery of the particular product to a

delivery site.

171.    For example, Instacart contacts through the communications device one of the

plurality of agents for a location having the first set of one or more goods.

172.    As an example, Instacart electronically transmits, in real-time, information on

the first set of one or more goods to the first customer using the digital image capture device in

the smartphone of the agent, including obtaining an image of a particular product of the first set

of the one or more goods and sends the image for the first customer to inspect and approve the

purchase of the particular product exactly shown in the image.





https://www.youtube.com/watch?v=339hDS2NHX4

173.    Further, as an example, Instacart acquires a particular product by the agent for

the customer and delivers that particular product.



https://youtu.be/PksAfCz6akw?t=103

At it's simplest, our logistics problem can be viewed as solving a TSP
(traveling salesman problem) where the shopper must go to the store first.
For example, the shopper drives to the store, picks your groceries (along
with two other orders), and then delivers them in a sequence:



Exhibit 7, https://tech.instacart.com/space-time-and-groceries-a315925acf3a.

174.    Instacart's infringement of the '835 Patent has injured and continues to injure

Consumeron in an amount to be proven at trial, but not less than a reasonable royalty.

175.     On information and belief, Instacart is aware of Consumeron's patent portfolio, including the '835 Patent.  On information and belief, Instacart has known of and possessed information regarding the Asserted Patents.  On or about March 21, 2018, Consumeron informed Instacart of its patent portfolio and Instacart's infringement thereof.

176.     Instacart's infringement has caused and is continuing to cause damage and irreparable injury to Consumeron and Consumeron continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

177.     Consumeron is entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284 and 285.

## COUNT VIII
### (Indirect Infringement of the '835 Patent)

178.     Consumeron repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

179.     Instacart has induced and continues to induce infringement of one or more claims of the '835 Patent under 35 U.S.C. § 271(b). Instacart has contributorily infringed and continues to contributorily infringe of one or more claims of the '835 Patent under 35 U.S.C. § 271(c).

180.     In addition to directly infringing the '835 Patent, Instacart indirectly infringes the '835 Patent pursuant to 35 U.S.C. § 271(b) by instructing, directing and/or requiring others, including customers, purchasers, shoppers, users and developers, to perform one or more of the steps of the method claims, either literally or under the doctrine of equivalents, of the '835 Patent, where all the steps of the method claims are performed by either Instacart, its customers, purchasers, shoppers, users, and developers, or some combination thereof.  Instacart knew or was willfully blind to the fact that it was inducing others, including customers,

purchasers, shoppers, users, and developers, to infringe by practicing, either themselves or in conjunction with Instacart, one or more method claims of the '835 Patent, including at least Claims 1, 24 and 26.

181.    Instacart knowingly and actively aided and abetted the direct infringement of the '835 Patent by instructing and encouraging its customers, purchasers, shoppers, users, and developers to use the '835 Accused Systems and Services.  Such instructions and encouragement include, but is not limited to, advising third parties to use the '835 Accused Systems and Services in an infringing manner, providing a mechanism through which third parties may infringe the '835 Patent, and by advertising and promoting the use of the '835 Accused Systems and Services in an infringing manner, and distributing guidelines and instructions to third parties on how to use the '835 Accused Systems and Services in an infringing manner.  Further examples of this instruction and encouragement include, for example, trainings by Instacart either in-person or by instructional videos and material, for its full-service and in-store shoppers as to how to utilize the Instacart application of the mobile agent system, and how to acquire and deliver a set of one or more goods as requested by customers utilizing the Instacart application or Instacart website.

182.    Instacart updates and maintains help and customer service sections on its website which cover in-depth aspects of operating the Accused Systems and Services in an infringing manner.  Further, Instacart advertises on its website the Accused Systems and Services infringing features and instructs consumers on how to configure and use the Accused Systems and Services in an infringing manner.  *See, e.g.*, Exhibit 13, https://www.instacart.com/help.

183.    Instacart contributorily infringes the '835 Patent pursuant to 35 U.S.C. § 271(c)

because it has provided material components of claims of the '835 Patent.  In particular, Instacart knows that its systems and Instacart application are particularly suited to be used in an infringing manner and are particularly suited for this use.  The '835 Accused Systems and Services include the Instacart application and supporting servers and software, which are developed and specialized for remote acquisition and delivery of goods, and are not staple articles or commodities of commerce because they are specifically made to be used in an infringing manner, as described in the direct infringement claim above.  Instacart has known or has been willfully blind to the fact that it is contributing to the infringement of one or more claims of the '835 Patent, including at least Claims 1, 24 and 26.

184.    Instacart has knowingly and actively contributed to the direct infringement of the '835 Patent by its manufacture, use, offer to sell, sale and importation of the '835 Accused Systems and Services together with its manufacturers, customers, purchasers, shoppers, users, developers, and/or vendors to meet the elements of the '835 Patent, as described above and incorporated by reference here.  Furthermore, Instacart's customers, purchasers, shoppers, users, developers, vendors, and/or manufacturers also directly infringe these claims jointly with Instacart, to the extent specific components are provided by those third parties.  To the extent Instacart's customers, purchasers, shoppers, users, developers, vendors, and/or manufacturers direct and control the methods in the claims; Instacart obtains benefits from the control of the system as a whole.  Instacart requires its customers, purchasers, shoppers, users, developers, vendors, and/or manufacturers to put the methods described in the claims into service to obtain the benefit of Instacart's services.

185.    Instacart's indirect infringement of the '835 Patent has injured and continues to injure Consumeron in an amount to be proven at trial, but not less than a reasonable royalty.

186.     Instacart's infringement has caused and is continuing to cause damage and irreparable injury to Consumeron, and Consumeron will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

187.     Consumeron is entitled to injunctive relief, damages and any other relief in accordance with 35 U.S.C. §§ 283, 284 and 285.

## **PRAYER FOR RELIEF**

WHEREFORE, Consumeron prays for judgment and relief as follows:

A.     An entry of judgment holding that Instacart has infringed and is infringing the '594 Patent, '191 Patent, '067 Patent, and '835 Patent; and has induced infringement and is inducing infringement of the '594 Patent, '191 Patent, '067 Patent and '835 Patent;

B.     A preliminary and permanent injunction against Instacart and its officers, employees, agents, servants, attorneys, instrumentalities, and/or those in privity with them, from infringing, or inducing the infringement of the '594 Patent, '191 Patent, '067 Patent, and '835 Patent and for all further and proper injunctive relief pursuant to 35 U.S.C. § 283;

C.     An award to Consumeron of such damages as it shall prove at trial against Instacart that is adequate to fully compensate Consumeron for Instacart's infringement of the '594 Patent, '191 Patent, '067 Patent, and '835 Patent, said damages to be no less than a reasonable royalty;

D.     An award to Consumeron of increased damages under 35 U.S.C. § 284;

E.     A finding that this case is "exceptional" and an award to Consumeron of its costs and reasonable attorneys' fees, as provided by 35 U.S.C. § 285;

F.      An accounting of all infringing sales and revenues, together with post judgment interest and prejudgment interest from the first date of infringement of the '594 Patent, '191 Patent, '067 Patent, and '835 Patent; and

G.      Such further and other relief as the Court may deem proper and just.

## DEMAND FOR JURY TRIAL

Consumeron demands a jury trial on all issues so triable.

|  |  |
|---|---|
|  | POTTER ANDERSON & CORROON LLP |
| OF COUNSEL: | |
| Paul J. Andre | By:  */s/ Philip A. Rovner* |
| Lisa Kobialka | Philip A. Rovner (#3215) |
| James Hannah | Jonathan A. Choa (#5319) |
| Christina M. Finn | P.O. Box 951 |
| KRAMER LEVIN NAFTALIS | Wilmington, DE 19899 |
|   & FRANKEL LLP | (302) 984-6000 |
| 990 Marsh Road | provner@potteranderson.com |
| Menlo Park, CA 94025 | jchoa@potteranderson.com |
| (650) 752-1700 | |
|  | *Attorneys for Plaintiff* |
| Date:  December 3, 2021 | |