IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CONSUMERON, LLC | | |
| | Plaintiff, | |
| v. | | Civil Action No. 21-1147-GBW |
| MAPLEBEAR Inc., d/b/a INSTACART | | |
| | Defendant. | |

---

Philip A. Rovner, Jonathan A. Choa, POTTER ANDERSON & CORROON, LLP, Wilmington, Delaware; Christina M. Finn, James R. Hannah, Lisa Kobialka, Paul J. Andre, KRAMER LEVIN NAFTALIS & FRANKEL LLP, Menlo Park, California

*Counsel for Plaintiff*

John W. Shaw, Nathan R. Hoeschen, SHAW KELLER LLP, Wilmington, Delaware; David J. Silbert, Michelle Ybarra, Christopher S. Sun, Bilal Malik, JD Schneider, Mark E. Strickland, Ryan K. Wong, KEKER, VAN NEST & PETERS LLP, San Francisco, California

*Counsel for Defendant*

**<u>MEMORANDUM OPINION</u>**

January 18, 2023
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Plaintiff Consumeron, LLC ("Consumeron") alleges that Defendant Maplebear Inc. d/b/a Instacart ("Instacart") directly and indirectly infringed various claims of U.S. Patent Nos. 8,244,594 (the "'594 Patent"), 9,202,191 (the "'191 Patent"), 10,115,067 (the "'067 Patent"), and 10,628,835 (the "'835 Patent") (collectively, the "Asserted Patents"). D.I. 29 ¶¶ 77, 85, 104, 114, 130, 140, 156, 166, 179. Before the Court is the parties' joint request that the Court construe ten (10) terms found in the claims of the Asserted Patents. *See* D.I. 161-1. The Court has reviewed the parties' briefing, D.I. 73; D.I. 74; D.I. 78; D.I. 79, and Joint Revised Claim Construction Chart, D.I. 161-1, and held a hearing on January 9, 2023, D.I. 193. The Court adopts constructions for the ten (10) terms at issue for the reasons below.

## I.    BACKGROUND

The Court denied Instacart's motion to dismiss Consumeron's First Amended Complaint (the "Complaint," D.I. 29) for Failure to State a Claim (D.I. 33) in an oral ruling on April 28, 2022. D.I. 51. As the Court explained, "I reached this conclusion not because I am confident that these patents are eligible under Section 101, but because we are still at the Rule 12 stage. And there are things in the record that are in [Consumeron]'s favor that I have to take as true." D.I. 54 at 55:1–6. The Court rejected Consumeron's request to construe certain means-plus-function terms prior to ruling on the motion to dismiss because it would not "make any difference to the Section 101 analysis." D.I. 54 at 58:13–23. The Court then found that the claims asserted were "directed to [the] abstract idea . . . [of] 'using computing devices to exchange information to facilitate the acquisition and delivery of goods via personal shoppers.'" D.I. 54 at 59:14–21. These ideas "are abstract[,]" the Court explained, because "these are really fundamental economic practices

1

involving simple information exchange." D.I. 54 at 61:6–24 (citing *Baggage Airline Guest Servs., Inc. v. Roadie, Inc.*, 351 F. Supp. 3d 753 (D. Del.), aff'd, 783 F. App'x 1022 (Fed. Cir. 2019)). However, at step two of its analysis under § 101—which considers "whether the claims contain an element, elements or an ordered combination that insures the patent in practice amounts to significantly more than a patent upon the ineligible concept itself"—the Court explained that "there is a factual dispute as to whether the claimed combination of the structural and functional elements captured in the claims was conventional, routine and well understood at the time of the invention." D.I. 54 at 66:20–67:15. The Court sought further briefing on this issue at the conclusion of its *Markman* hearing. D.I. 190.

The parties' Scheduling Order, entered on January 12, 2022, set forth the briefing schedule for claim construction and set a *Markman* hearing for August 1, 2022. D.I. 37 ¶¶ 12–14. However, on April 28, 2022, the case was reassigned to the District of Delaware's Vacant Judgeship, D.I. 52, where it remained until September 8, 2022. The parties' initial claim construction chart recited twenty-four (24) disputed terms, D.I. 70, but the parties narrowed their disputes to ten (10) terms in their opening, D.I. 72; D.I. 73, and responsive, D.I. 78; D.I. 79, claim construction briefs. The parties completed briefing on July 18, 2022. D.I. 78: D.I. 79. Instacart moved on September 30, 2022 to stay this action pending resolution of *inter partes* review of the Asserted Patents, D.I. 123, and Chief Magistrate Judge Mary Pat Thynge denied Instacart's motion on October 19, 2022 because "it is difficult to interpret Instacart's actions in this matter as anything other than an attempt to gain tactical advantage over Consumeron" and because various factors weighed against the grant of a stay, D.I. 137 ¶¶ 27, 29. After the parties failed to further narrow the claim terms in dispute, D.I. 138; D.I. 152, the Court scheduled and held a *Markman* hearing on January 9, 2023, D.I. 154; D.I. 193.

Pending now is the parties' request that the Court construe ten (10) disputed terms.  D.I.
161-1.  Instacart argues that four (4) of the disputed terms are indefinite, and Consumeron argues
that two of those terms are means-plus-function terms.  *Id.*  According to their Joint Revised Claim
Construction Chart, the parties proposed the following constructions:

| | Term | Consumeron | Instacart |
|---|---|---|---|
| A | Steps of Method Claim<br><br>All asserted claims of '594 Patent, '067 Patent, '835 Patent | Steps do not need to be performed in order | Steps must be performed in order |
| B | "Deploying/locating a plurality of delivery agents of a service provider to/at various geographic locations"<br><br>'067 Patent, claim 19; '594 Patent, claims 1, 13; '835 Patent, claims 1, 24 | Plain and ordinary meaning | Instructing multiple delivery agents of a service provider to locate themselves in specific cities or neighborhoods |
| C | "mobile agent system"/ "mobile delivery agent systems"<br><br>'835 Patent, claims 1, 2, 24, 26; '191 Patent, claims 1, 11, 14; '594 Patent, claims 1, 13; '067 Patent, claims 1, 2, 27, 28 | One or more mobile computing devices having image capturing and communications capability which can (1) receive product data over the internet from a remote server, where the product data corresponds to a customer request, and (2) provide to the customer an image of a product in real-time as well as acquisition and delivery information of the product | A system including an energy efficient vehicle, a real-time video device, a global positioning system (GPS), a communication device, and a printer |
| D | "Most efficiently carry out the first acquisition request"<br><br>'594 Patent, claim 13; '067 Patent, claim 5 | Plain and ordinary meaning which is "determining which delivery agent should be deployed based on the location of the delivery agent, the location of the goods, and the location of the delivery site" | Term is indefinite |
| E | "Progress information via real-time imaging of the one or more images"<br><br>'191 Patent, claim 1 | "Viewing one or more images of one or more goods as the goods are acquired" | Term is indefinite |

| | Term | Consumeron | Instacart |
|---|---|---|---|
| F | "Real-time"<br><br>'191 Patent, claims 1, 10, 11, 12, 14; '835 Patent, claims 1, 14, 15, 24, 26; '594 Patent, claims 1, 4, 8, 13; '067 Patent, claim 18 | Plain and ordinary meaning, which is "data that is passed along as it is gathered" | "Data (i.e. video, audio, images, etc.) that is transmitted at the same moment the data is created" |
| G | "communication means for *processing the acquisition request from the customer and establishing direct communication between the customer and the selected delivery agent during both the acquisition and delivery of the one or more goods to the customer*"<br><br>'191 Patent, claim 11 | **Function:** Emphasized text<br><br>**Structure:** server 14 and communications device 48 as described in '191 Patent at 2:54–3:22, 5:36–50, 8:15–18, 8:49–9:4. | Term is indefinite. |
| H | "a real-time video means for *sending at least one image to the customer through the communication means and transmitting real-time data to the display for the customer to view the one or more goods and the respective agent's progress during performance of the acquisition request*"<br><br>'191 Patent, claim 11 | **Function:** Emphasized text<br><br>**Structure:** MDAS described in '191 Patent at 3:19–22, 5:25–27, or 8:41–43, 8:65–9:2 | **Function:** Emphasized text<br><br>**Structure:** mobile delivery agent system 42, server 14, and customer computer 30, as shown in figure 1, and described in '191 Patent at abstract, 1:64–2:8, 2:20–26, 2:54–3:7, 3:8–32, 4:34–58, 6:14–21, 6:36–39, 6:42–46, 6:53–65, 8:5–23, 8:38–48, 8:49–9:9, 9:35–37, claims 1, 5, 10, 11, 12, 14, figs. 1, 3 |
| I | "means for *sending one or more images in real-time to the customer from the mobile agent through the local communication link and providing the customer with progress information via real-time imaging of the one or more images from the mobile agent to the customer computer during performance of the acquisition request, including viewing the one or more goods from a pick-up site for the one or more goods during the shopping event*"<br><br>'191 Patent, claim 14 | **Function:** Emphasized text<br><br>**Structure:** MDAS described in '191 Patent at 3:19–22, 5:25–27, or 8:41–43, 8:65–9:2 | Term is indefinite |
| J | "communication means, *establishing direct communication* | **Function:** Emphasized text | **Function:** Emphasized text |

| Term | Consumeron | Instacart |
|---|---|---|
| *between the customer and the mobile agent, for communicating approval by the customer to the mobile agent in connection with completing the acquisition request"*<br><br>'191 Patent, claim[] 14 | **Structure**: communications device 48, as described in '191 Patent at 2:56–3:6, 5:20–35 | **Structure**: mobile delivery agent system 42 and customer computer 30, as shown in figure 1, and described in '191 Patent at abstract, 1:64–2:8, 2:54–3:7, 5:20–25, 6:53–65, 6:66–7:26, 8:5–23, 8:38–48, 8:49–9:9, 9:35–37, claims 1, 6, 14, figs. 1, 3 |

*See* D.I. 161-1; D.I. 193 at 61:19–62:5, 63:16–24.

The '594 Patent is entitled "Method for Remote Acquisition and Delivery of Goods" and the '191 Patent, '067 Patent, and '835 Patent are entitled "System and Method for Remote Acquisition and Delivery of Goods." D.I. 29-1, Ex. 1 ('594 Patent); D.I. 29-1, Ex. 2 ('191 Patent); D.I. 29-1, Ex. 3 ('067 Patent); D.I. 29-1, Ex. 4 ('835 Patent) (using "deliver" instead of "delivery"). The later three patents are related to the '594 Patent, and the Asserted Patents, thus, share at least some of their written descriptions in common. *See* '191 Patent at 1:7–14; '067 Patent at 1:7–19; '835 Patent at 1:7–20.

## II.   LEGAL STANDARDS

### A. Claim Construction

"'[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation omitted); *Aventis Pharms. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (same). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324. The Court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.* The ultimate question of the proper construction of a patent is a question of law, although "subsidiary factfinding is sometimes necessary." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326–27 (2015); *see Markman*

*v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996) ("the construction of a patent . . . is exclusively within the province of the court.").

"The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history."[1] *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1313); *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016) (similar). The "'only two exceptions to this general rule'" are (1) when a patentee defines a term or (2) disavowal of "'the full scope of a claim term either in the specification or during prosecution.'" *Thorner*, 669 F.3d at 1365 (citation omitted).

The Court "'first look[s] to, and primarily rel[ies] on, the intrinsic evidence,'" which includes the claims, written description, and prosecution history and "'is usually dispositive.'" *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) (citation omitted). "[T]he specification ' . . . is the single best guide to the meaning of a disputed term.'" *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1340 (Fed. Cir. 2016) (citation omitted). "'[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.' When the patentee acts as its own lexicographer, that definition governs." *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019) (quoting *Phillips*, 415 F.3d at 1316). However, "'[the Court] do[es] not read limitations from the embodiments in the specification into the claims.'" *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1310 (Fed. Cir. 2017) (citation omitted)). The "written

---

[1] Practitioners often use "specification," which includes the written description and claims, to refer to the written description only. *See Bd. of Regents v. Bos. Sci. Corp.*, 2022 WL 17039729, at *3 n.1 (D. Del. Nov. 17, 2022) (citation omitted). The Court endeavors to use "written description" where intended herein.

description . . . is not a substitute for, nor can it be used to rewrite, the chosen claim language." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

The Court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370; *Cont'l Cirs.*, 915 F.3d at 796 (same). The prosecution history may "'demonstrat[e] how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution . . . .'" *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1377 (Fed. Cir. 2021) (quoting *Phillips*, 415 F.3d at 1317).

The Court may "need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 574 U.S. at 331. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980; *Phillips*, 415 F.3d at 1317 (same). Extrinsic evidence may be useful, but it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Cont'l Cirs.*, 915 F.3d at 799 (internal quotation marks and citations omitted). However, "[p]atent documents are written for persons familiar with the relevant field . . . . Thus resolution of any ambiguity arising from the claims and specification may be aided by extrinsic evidence of usage and meaning of a term in the context of the invention." *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1119 (Fed. Cir. 2002); *see Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 899 (2014) (explaining that patents are addressed "to those skilled in the relevant art").

**B. Indefiniteness**

Section 112 of the Patent Act requires that the claims of a patent "particularly point[] out and distinctly claim[] the subject matter which the inventor . . . regards as the invention." 35

U.S.C. § 112(b). The "primary purpose of the definiteness requirement" that § 112(b) contains "is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, *e.g.*, competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779–80 (Fed. Cir. 2002).

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014); *see Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015) (similar). While a "'potential infringer'" need not "'be able to determine *ex ante* if a particular act infringes the claims,'" the patentee must "apprise the public 'of what is still open to them[]'" such that "a person of ordinary skill in the art could determine whether or not an accused product or method infringes the claim." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1346–47 (Fed. Cir. 2022) (citations omitted).

Like claim construction, definiteness is a question of law, but the Court must sometimes render factual findings based on extrinsic evidence to resolve the ultimate issue of definiteness. *See Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017). The challenger must "prov[e] indefiniteness by clear and convincing evidence." *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

### C. Means-Plus-Function Claim Terms

The Patent Act provides that

[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112(f); 35 U.S.C. § 112 ¶ 6 (2006) (same).  Such "[a] means-plus-function limitation recites a function to be performed rather than definite structure or materials for performing that function." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003). "The duty of a patentee to clearly link or associate structure with the claimed function is the quid pro quo for allowing the patentee to express the claim in terms of function under section 112 . . . ." *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003); *see Twin Peaks Software Inc. v. IBM Corp.*, 690 F. App'x 656, 660 (Fed. Cir. 2017) (citing *Med. Instrumentation & Diagnostics*, 344 F.3d at 1211).  While "use of the word 'means' in a claim element creates a rebuttable presumption" that a term is a means-plus-function term—and while the absence thereof "also creates a rebuttable presumption" that a term is not a means-plus-function term—it is not automatic. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015).

"Construction of a means-plus-function limitation includes two steps. 'First, the court must determine the claimed function.  Second, the court must identify the corresponding structure in the written description of the patent that performs the function.'" *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012) (citation omitted); *Via Vadis, LLC v. Blizzard Ent., Inc.*, 815 F. App'x 539, 545 (Fed. Cir. 2020) (same).

> Structure disclosed in the specification qualifies as 'corresponding structure' if the intrinsic evidence clearly links or associates that structure to the function recited in the claim.  Even if the specification discloses corresponding structure, the disclosure must be of 'adequate' corresponding structure to achieve the claimed function. . . .  [I]f a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim, a means-plus-function clause is indefinite.

*Williamson*, 792 F.3d at 1352 (citing *Noah Sys.*, 675 F.3d at 1311–12) (citations omitted); *see also Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1007 (Fed. Cir. 2021) ("[S]tructure disclosed in the specification is corresponding structure only if the specification or

prosecution history clearly links or associates that structure to the function recited in the claim." (citation omitted)).

## III.   CONSTRUCTION OF DISPUTED TERMS

For the reasons below, the Court construes the ten (10) patent terms in dispute.

### A.  Steps of Method Claim

In its briefing, Instacart argued that, "logically and according to the alleged invention's stated purpose, *certain* steps must be performed before certain others." D.I. 73 at 20 (emphasis in original); *see* D.I. 161-1 at 1.  Consumeron argued that, "[b]ecause not all the steps of asserted method claims here actually recite an order, the default 'no order' should remain." D.I. 72 at 18. However, during the *Markman* hearing, the parties appeared to agree that steps of method claims do not need to be performed in order unless the claim recites an order. *See* D.I. 193 at 111:10–112:4 (Instacart accepting that the specific claim must recite an order but asserting the claim may do so implicitly), 113:10–13 (Consumeron accepting the Court's proposal).

However, even if the parties had not so agreed, the Court would adopt a construction that "steps of method claims do not need to be performed in order unless the claim recites an order." "A claim requires an ordering, when steps of a method actually recite an order, or when claim language, as a matter of logic, requires that the steps be performed in the order written." *Microsoft Corp. v. Uniloc 2017 LLC*, 2022 WL 11531235, at *3 (Fed. Cir. Oct. 20, 2022).  Instacart points to no claim in any of the Asserted Patents that requires a particular order.  D.I. 73 at 20.  In fact, as Instacart acknowledges, *id.*, the Asserted Patents recite that "the steps for the methods of remote acquisition and delivery of goods described herein do not necessarily need to be in the order in which they are presented above[,]" '594 Patent at 9:36–39; '191 Patent at 9:37–40; '067 Patent at 9:67–10:3; '835 Patent at 10:59–63.  Instacart also points to no claim language that would logically require a particular order.  *See* D.I. 73 at 19-20 (neither citing nor quoting any claim language);

D.I. 78 at 19–20 (same).  Instacart admits that "*every* step need not necessarily be performed in the order written . . . ." D.I. 78 at 20 (emphasis in original).  The Court declines to impose a default rule where Instacart fails to show one is required.  Thus, the steps of method claims do not need to be performed in order unless the claim recites an order.

### B. "Deploying/locating a plurality of delivery agents of a service provider to/at various geographic locations"

Instacart argues that the term "[d]eploying/locating a plurality of delivery agents of a service provider to/at various geographic locations" in claim 19 of the '067 Patent and claims 1 and 13 of the '594 patent should be construed as "[i]nstructing multiple delivery agents of a service provider to locate themselves in specific cities or neighborhoods." D.I. 161-1 at 1.  Instacart argues that its construction "makes clear that the 'geographic location' where an agent is instructed to locate him- or herself is a city or neighborhood." D.I. 73 at 14.  Consumeron takes issue with the substitution of "instructing" for "deploying" or "locating" and with the substitution of "specific cities or neighborhoods" for "various geographic locations" because "the intrinsic record does not require 'instructing' or even mention 'cities or neighborhoods.'"  D.I. 72 at 14.  Further, Consumeron argues, the written description permits a customer to use a delivery agent in another country. D.I. 79 at 15–16.  Claim 19 of the '067 Patent depends on Claim 1 and claims "deploying a plurality of delivery agent systems to various geographic locations." '067 Patent at Claim 19.  Claims 1 and 13 of the '594 Patent claim, in relevant part, "deploying a plurality of delivery agents of a service provider to various geographic locations . . . ." '594 Patent at 9:46–47, 10:61–62.  By agreement of the parties, this construction also applies to "locating . . . at various geographic locations" in Claim 1 and Claim 24 of the '835 Patent. D.I. 193 at 61:19–62:5.  During the *Markman* hearing, the parties agreed that "deploying" or "locating" should be construed as "positioning." *Id.* at 62:11–23.

The Court turns to the written description to construe the claims. "[T]he specification ' . . . is the single best guide to the meaning of a disputed term.'" *Akzo Nobel Coatings*, 811 F.3d at 1340. The '594 Patent, the '067 Patent, and the '835 Patent teach that "a customer may utilize a delivery agent in a different country or city in order to shop remotely for a desired product . . . ." '067 Patent at 9:61–65; '594 Patent at 9:30–34; '835 Patent at 10:53–57. During the *Markman* hearing, Instacart argued that, even if the delivery agent may be in a different country, the agent must still be proximate to the goods purchased. D.I. 193 at 59:14–22. However, ASC provides no language in the Asserted Patents that disclaims long-distance delivery agent travel (e.g., across state lines) to acquire the goods. *See, e.g.*, '594 Patent at 5:3–5 (permitting a customer to select a delivery agent from "a larger area" when none "is in the immediate area selected"). Since the written descriptions permit a customer to use a delivery agent in a "city" or "country," the Court does not construe the claim term to require a location in "specific cities or neighborhoods."

Instacart offers two further responses. First, Instacart argues that "such a large location defies the purpose of the alleged invention—which is to quickly provide consumer goods to consumers." D.I. 78 at 13. However, the '594 Patent, the '067 Patent, and the '835 Patent explain only that "[t]he present invention is directed to a system and method for remote acquisition and delivery of goods." '594 Patent at 1:64–65; '067 Patent at 2:3–4; '835 Patent at 2:9–10. The '594 Patent does not mention the words "quick" or "fast," save that a "a customer may be able to pay a premium for a faster delivery" rather than permit their delivery agent to acquire goods for multiple customers at once. '594 Patent at 6:20–32; *see* '067 Patent at 6:41–48 (same); '835 Patent at 6:65–7:3 (same). Thus, the Court disagrees that the Asserted Patents are primarily directed to "quickly provid[ing]" delivery of goods. Second, Instacart argues that the prosecution history supports its construction because the prosecution history connects language found in Claims 1 and 24 of the

12

'835 Patent to column 4 line 53 through column 5 line 24 of the '835 Patent. D.I. 73 at 14 (citing

D.I. 70-1 at CMRN 1545). The written description explains that a "customer may enter into the

area he or she is interested in obtaining services . . . , such as by entering his or her local zip code

or the address of a store . . . ." '835 Patent at 4:53–5:24. However, use of the customer's zip code

or a store's address are only two *options* for locating the proper delivery agent, and the cited text

permits a user to "zoom in and zoom out" on a map of delivery agent locations, which implies that

the selected delivery agent need not be in the "desired area" that a customer is first shown in the

preferred embodiment. *Id.* Thus, the Court finds no limitation that it should read back into the

claims of the '594 Patent, '067 Patent, and '835 Patent.

The Court construes the term "deploying/locating . . . to/at various geographic locations,"

in the three claims at issue here, as "positioning . . . at various geographic locations."

### C. "Mobile agent system"/"mobile delivery agent systems"

The parties agree that the Court must construe the term "mobile agent delivery system"

("MDAS") because it is unique to the Asserted Patents. D.I. 72 at 2–3; D.I. 73 at 3. Consumeron

argues that the Court should construe MDAS as

> one or more mobile computing devices having image capturing and
> communications capability which can (1) receive product data over the Internet
> from a remote server, where the product data corresponds to a customer request,
> and (2) provide to the customer an image of a product in real-time as well as
> acquisition and delivery information of the product.

D.I. 72 at 2. Instacart argues that the Court should construe MDAS as "a system including an

energy efficient vehicle, a real-time video device, a global positioning system (GPS), a

communication device, and a printer[.]" D.I. 73 at 3. Consumeron argues that Instacart's

construction "adds extraneous components of the system from the dependent claims[,]" including

an energy efficient vehicle and a printer, "without any support in the intrinsic record." D.I. 72 at

4. Instacart argues that it obtains its definition from the written descriptions and abstracts of the

Asserted Patents and that the Asserted Patents "disavow[] any version of the invention that lacks" an energy efficient vehicle, a GPS, a communications device, a printer, and a real-time video device. D.I. 73 at 5. Instacart also points to figure 1 of each of the Asserted Patents and argues that Consumeron's definition "lacks many of these required features . . . ." D.I. 73 at 5–6.

The written descriptions of three of the Asserted Patents teach that a MDAS "includes an energy efficient vehicle, a real-time video device, a [GPS], a communication device and a printer." '594 Patent at 2:3–6; '191 Patent at 2:5-8; '067 Patent at 2:9–12. However, the '835 Patent teaches that the above is "[i]n accordance with a preferred embodiment[.]" '835 Patent at 2:16–21. The written descriptions of the other three Asserted Patents also explain that the "[s]erver [] is in contact with a plurality of [MDASs] . . . . Each mobile system [] *preferably* includes a real-time video device [], a [GPS] [], a communications system or device [] and a printer []." '594 Patent at 3:10–14; '191 Patent at 3:12–16; '067 Patent at 3:17–21 (emphasis added). Claim 2 of the '191 Patent claims "[t]he system of claim **1**, wherein each of the plurality of delivery agent systems further comprises a mobile printer . . . ." '191 Patent at Claim 2; *see also* '594 Patent at Claim 11 ("The method of claim **10**, wherein the each [sic] mobile delivery system further includes a printer . . . ."); '067 Patent at Claim 11 ("The method of claim **1**, wherein the mobile delivery system further includes a printer . . . ."); '835 Patent at Claim 12 ("The method of claim **11**, wherein each mobile agent system further includes a printer . . . ."). Since each Asserted Patent clarifies that the MDAS only *preferably* includes all of the elements that Instacart demands, the Court rejects Instacart's proposed construction.

Instacart opposes Consumeron's proposed construction because it fails to include an energy-efficient vehicle and "does not encompass any means of obtaining location data from delivery agents via GPS—an element of a preferred embodiment of the claimed invention and a

limitation that is present in the vast majority of Consumeron's asserted claims." D.I. 73 at 7. Both the '594 Patent and '191 Patent include a GPS in their MDAS. *See* '594 Patent at Claims 1, 13; '191 Patent at Claims 1, 14. However, at least one dependent claim of the '191 Patent would add an energy-efficient vehicle to the MDAS, *see* '191 Patent at Claim 5, and at least one dependent claim of the '067 Patent adds a GPS, *see* '067 Patent at Claim 2. Also, two of the independent claims of the '835 Patent and each of the independent claims of the '067 Patent do not mention either an energy-efficient vehicle or a GPS in the MDAS. *See* '835 Patent at Claims 1, 24; '067 Patent at Claims 1, 27, 28. Courts should generally construe patent terms consistently across patents that share a parent application and common terms, but the same rule does not apply to patents in different families that claim separate inventions. *See Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1369 (Fed. Cir. 2016). Here, the '594 Patent stemmed from U.S. Patent Application 12/711,867 (the "'867 Application"), *see* '594 Patent at Page 1; the '191 Patent is a divisional application of the '867 Application, '191 Patent at 1:5–10; the '067 Patent "claims the benefit of" the '867 Application, '067 Patent at 1:5–17; and the '835 Patent is a continuation-in-part of the '867 Application, '835 Patent at 1:5–20. Also, the parties make no distinction among the Asserted Patents, which all claim the same or highly similar inventions and have overlapping written descriptions. Thus, the Court finds that it is appropriate to construe MDAS consistently across the Asserted Patents.

"The doctrine of claim differentiation creates a presumption that distinct claims, particularly an independent claim and its dependent claim, have different scopes." *World Class Tech. Corp. v. Ormco Corp.*, 769 F.3d 1120, 1125 (Fed. Cir. 2014). Instacart argues that this doctrine should not apply to "coined" (i.e., wholly new or invented) claim terms. D.I. 193 at 28:17–29:17. However, the Court disagrees and notes that the written description may not

"rewrite" the "claim language." *SuperGuide*, 358 F.3d at 875; *see Phillips*, 415 F.3d at 1312. Thus, the Court declines to require that the MDAS include a GPS or an energy-efficient vehicle where at least one dependent claim would add an energy-efficient vehicle or a GPS to the MDAS. The Court's decision as to a GPS would not affect any claims that define a MDAS to include a GPS, *see, e.g.*, '594 Patent at Claim 1, since inclusion of a GPS would remain a claim limitation.

Instacart also argues that Consumeron's construction adds ambiguous limitations that the Asserted Patents do not support. D.I. 73 at 8; D.I. 78 at 3. Consumeron argues that "person[s] of ordinary skill in the art . . . understand that mobile computing devices are portable computing devices, and that image capturing and communications capability means the devices can capture images and communicate with other devices." D.I. 79 at 4. Consumeron points to a preferred embodiment in the '835 Patent as evidence for its "mobile computing device[]" limitation, *id.*, and asserts that the "common sense" would require such a device, D.I. 193 at 34:9–17.

The Court turns to the claims. Claim 1 of both the '835 Patent and the '067 Patent claim a MDAS that includes "a digital image capture device and a communication device," where the MDAS or communication device communicates with a remote server. *See also* '835 Patent at Claim 24; '067 Patent at Claims 27, 28 (same). Claims 1 and 13 of the '594 Patent claim a MDAS "in communication with at least one remote server" that includes "a real-time video device," a GPS device, "and a communication device[.]" Claims 1 and 14 of the '191 Patent add additional limitations to a MDAS, which include required configurations for a "real-time video device" and a requirement that the communications device can communicate directly with a customer. The Court next turns the written descriptions. The written descriptions of the Asserted Patents nowhere mention a "mobile computing device." Further, the written descriptions of each of the Asserted Patents teach that the internet is only one network that the MDAS may use to communicate with a

server. *See* '594 Patent at 1:65–67 (describing communication "via a website on the interne[t] or through a network"); '191 Patent at 2:1–2 (same); '067 Patent at 2:4–6 (same); '835 Patent at 2:10–13 (same); '067 Patent at Claims 1, 28 (allowing receipt by a "remote server . . . through the internet or a network"). Thus, the Court does not construe a MDAS to include a "mobile computing device" or to require the use of the internet. Rather, the Court construes a MDAS as "a mobile system that includes at least a device to capture video or still images and a device set up to communicate with a remote server."

### D. "Most efficiently carry out the first acquisition request"

Instacart argues that the Asserted Patents "fail to inform a skilled artisan how to determine which delivery agent can 'most efficiently carry out' an acquisition request." D.I. 73 at 12. Consumeron argues that "[t]he two claims in which this term appears explain how to 'most efficiently carry out the first acquisition request,' as demonstrated when the term is viewed in the context of the claims[.]" D.I. 72 at 15. Instacart, here, has failed to meet its burden to "prov[e] indefiniteness by clear and convincing evidence." *BASF Corp.*, 875 F.3d at 1365.

Claim 13 of the '594 Patent claims, in part,

13. A method for remote acquisition and delivery of goods comprising: . . . receiving a first acquisition request from a first customer for a set of one or more goods; after receiving the first acquisition request, calculating which of the plurality of delivery agents could *most efficiently carry out the first acquisition request* using the at least one remote server, with the calculation being based, at least in part, on a location having the first set [of] one or more goods, a current location of the delivery agent as determined utilizing the global positioning device, and the delivery site . . . .

Claim 5 of the '067 Patent claims

5. The method of claim **1**, further comprising: after receiving the first acquisition request, calculating which of a plurality of delivery agent systems could *most efficiently carry out the first acquisition request* using the at least one remote server, with the calculation being based, at least in part, on the location having the first set [of] one or more goods, a current location of at least one of the plurality of delivery systems[,] and the delivery site.

The '594 Patent and the '067 Patent teach that the remote acquisition and delivery system "preferably includes one or more processors for optimizing efficiencies of the system and calculating the most efficient use of delivery agents based on the shopping location and the delivery site." '594 Patent at 2:29–33; '067 Patent at 2:36–39.

The prosecution history also addresses this claim language. The parties agree that Consumeron overcame a rejection of the "most efficiently" claim language for lack of written description. *See* D.I. 72 at 16; D.I. 78 at 12; D.I. 70-1 at CMRN 815. However, the written description requirement in § 112(a) differs from the definiteness requirement under § 112(b). Additionally, during prosecution of the '835 Patent, the Examiner explained that the "metes and bounds" of the "most efficiently carry out" language

> [are] unclear inasmuch as one of ordinary skill in the art cannot determine how to avoid infringement of this claim because they are not apprised of what is to calculation [sic]. The specification does not disclose any meaningful structure/algorithm explaining how one would generate the efficiency value rendering it unclear [] how this is accomplished and what are the metes and bounds of the claim.

D.I. 70-1 at CMRN 1637–38. However, the '835 Patent does not contain the "most efficiently carry out" claim term and so is not at issue here.

To determine indefiniteness, courts examine "the patent record—the claims, specification, and prosecution history—to ascertain if they convey to one of skill in the art with reasonable certainty the scope of the invention claimed." *Teva Pharms. USA*, 789 F.3d at 1341. Consumeron argues that the written description and claims "explain[] to one of ordinary skill in the art which inputs to use to make a determination as to the most efficient delivery agent to use." D.I. 72 at 16. Instacart argues that the claim language fails to explain whether the delivery agent that can "most efficiently carry out the first acquisition request" is the fastest, most fuel efficient, least costly, or

closest in distance. D.I. 78 at 11. The claim language clarifies that various location-based parameters—the locations of the goods, the delivery agent, and the drop-off site—are inputs into the efficiency calculation. However, location is likely a necessary input to determine the optimal delivery agent based on cost, time, distance, or fuel efficiency.

While Instacart has the burden of proof, the Court notes that Consumeron fails to point to language in the written description that could support the definiteness of its claims, save the "most efficient use of delivery agents" language discussed above. D.I. 72 at 15; D.I. 79 at 16. However, further review of the written descriptions at issue clarifies the issue. The '594 Patent and '067 Patent discuss energy efficient vehicles separately. *See* '594 Patent at 2:4; '067 Patent at 2:10. Thus, the "most efficient[]" language at issue here likely does not point to fuel efficiency. The '594 Patent also teaches that, "[p]referably, store locations are selected in a manner which optimizes efficiencies and reduces vehicle operating costs by selecting store locations that reduce travel time for the selected delivery agent" and that acquisition of goods for multiple customers in the same trip could realize "greater efficiencies . . . and discounts may be offered to customers . . . ." '594 Patent at 4:65–5:2, 6:20–30; *see also* '067 Patent at 5:11–16, 6:39–45 (same). On the one hand, the separate discussion of "efficiencies" and costs suggests that the patentee means "time efficient" when the patentee discusses efficiency. On the other hand, the connection the written description makes between efficiency and discounts suggests cost reduction is at least one of the goals that the '594 Patent targets. Indeed, the '594 Patent teaches that, in the prior art, delivery of goods caused "environmental" harm, was "often not cost effective," and was not sufficiently "immediate." *See* '594 Patent at 1:15–60.

In short, one of ordinary skill in the art would read the "most efficiently" claim limitation to require optimization only of either time or costs based on location parameters. Thus, the definite

19

universe of optimization outcomes would give a person of ordinary skill in the art notice of what inventions would violate the metes and bounds of the patent claim.  While the issue is close, Instacart has failed to meet its burden to show by clear and convincing evidence that the claims and written description of the '594 Patent and the '067 Patent do not "convey to one of skill in the art with reasonable certainty the scope of the invention claimed." *Teva Pharms. USA*, 789 F.3d at 1341.  The Court, instead, agrees with Consumeron and finds that the claim term "most efficiently carry out the first acquisition request" takes it plain and ordinary meaning, which is "determining which delivery agent should be deployed based on the locations of the delivery agent, goods, and delivery site."

### E.  "Progress information via real-time imaging of the one or more images"

Instacart argues that this "term is indefinite because it requires real-time imaging of real-time images, which is nonsensical."  D.I. 73 at 15.  Consumeron argues that Claim 1 of the '191 Patent, which contains the disputed term, D.I. 161-1 at 2, defines the claim term as "'viewing one or more images of one or more goods as the goods are acquired[,]'" D.I. 72 at 17.  "When analyzed as a whole," Consumeron argues, "the claims set forth that the images obtained using real-time imaging are used to provide the customer with progress information on the acquisition of such goods." D.I. 79 at 18.  Consumeron agreed at the *Markman* hearing to a construction of plain and ordinary meaning, which is "information about the status of the acquisition and delivery of a customer's acquisition request via one or more images."  D.I. 193 at 107:7–12.

Claim 1 of the '191 Patent claims, in part,

a real-time video device configured to send one or more images in real-time to the customer from the respective agent, wherein the real-time video device is configured to enable the customer to be provided with ***progress information via real-time imaging of the one or more images*** from the respective agent through the customer computer during performance of the acquisition request, including viewing the one or more goods from a pick-up site for the one or more goods . . . .

'191 Patent at 9:56–64.

The Court must determine whether "the claims, specification, and prosecution history . . . convey to one of skill in the art with reasonable certainty the scope of the invention claimed." *Teva Pharms. USA*, 789 F.3d at 1341. The Court does not "'rewrite claims to preserve their validity.'" *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1367 (Fed. Cir. 2021) (citation omitted). Instacart, here, must "prov[e] indefiniteness by clear and convincing evidence." *BASF Corp.*, 875 F.3d at 1365.

The '191 Patent does not appear to use the word "imaging" anywhere in its written description, and the parties do not explain what the word "imaging" would mean to a person of ordinary skill in the art in the context of the '191 Patent. While dictionaries may have multiple meanings or "choose a meaning that is not pertinent to the understanding of particular claim language[,] . . . [d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words . . . ." *Phillips*, 415 F.3d at 1322. Here, the Court consults a dictionary to better understand how the word "imaging" is ordinarily understood. The Oxford English Dictionary defines "imaging" in two ways:

> 1. The action or process of forming a mental image of something; an instance of this. Also: the action or process of representing something in written or pictorial or other artistic form.
> . . .
>
> 2. The action or process of forming an image of something by instrumental or technological means, typically for a purpose such as research, medical diagnosis, or reconnaissance.

*Imaging*, Oxford English Dictionary (Accessed Dec. 13, 2022), https://www.oed.com/view/Entry/272526. Either definition supports a "sensical" reading of the claim term: The delivery agent sends images of a good to the customer's computer. The customer uses these images to form an image of the good's status (i.e., "progress") in the delivery process

21

(or, as in the second definition, "reconnaissance" about the "progress" made).  One such image used to form an image of the good's status is a picture of "one or more goods from a pick-up site," '191 Patent at Claim 1, while another image could be, for example, a picture of the good when delivered to a customer's front door, *see id.* at 7:16–17 ("[T]he delivery agent will deliver the product directly to the customer's door or desired physical location.").

However, Consumeron's proposed construction unnecessarily limits "progress" (i.e., status) updates to the acquisition of goods.  Rather, a delivery of goods may—in fact, should—progress beyond the delivery agent's initial acquisition.  Thus, the Court adopts the construction to which Consumeron agreed: plain and ordinary meaning, which is "information about the status of the acquisition and delivery of a customer's acquisition request via one or more images."

### F.  "Real-time"

Consumeron asserts that "real-time" takes its plain and ordinary meaning in the Asserted Patents, or "data that is passed along as it is gathered."  During the *Markman* hearing, Consumeron explained that it seeks to avoid any definition of "real-time" that would exclude transmissions of images that require multiple clicks for the delivery agent.  D.I. 193 at 42:1–17.  Instacart asks the Court to construe "real-time" as "data (i.e. video, audio, images, etc.) that is transmitted at the same moment the data is created[.]"  *See* D.I. 161-1 at 2.  Instacart argues that its "construction conveys [the] commonsense distinction" that "'[r]eal-time' data is data that is sent instantaneously" while "data is not 'real-time' if it is first created and then subsequently transmitted."  D.I. 73 at 9–10.  However, at the *Markman* hearing, Instacart conceded that it does not seek to exclude any delay "based on the laws of physics and the technology you are using" and, instead, seeks only to exclude "intentional" delays in transmission.  D.I. 193 at 36:10–37:17.  The parties both assert that the same construction applies to "real-time" as used in each of the Asserted Patents.  *See* D.I. 72 at 12; D.I. 73 at 10.  The Court accepts the parties' agreement.

The written descriptions and claims of the Asserted Patents use the phrase "real-time" repeatedly.  Three of the Asserted Patents teach that

> [t]he real-time video device is utilized to deliver real-time video of the delivery agent on the way to the location, as well as video captured during execution of a purchase process.  The customer is allowed to interact with the delivery agent to inspect the product remotely using the real-time video device and the communications device.

'594 Patent at 2:18–23; '191 Patent at 2:20–25; '067 Patent at 2:24–29; *see also* '835 Patent at 2:34–37 ("The digital image capture device is utilized to deliver real-time digital images of the delivery agent on the way to the location . . . .").  The same patents later teach that, "[i]deally, [the] real-time video device [] is utilized to provide a streaming 'street view' for the customer's entertainment and to show the progress of the delivery agent . . . ." '594 Patent at 6:35–38; '191 Patent 6:36–39; '067 Patent at 6:51–54; *see also* '835 Patent at 7:6–9 (similar).  The '594 Patent, the '191 Patent, and the '067 Patent, teach two additional relevant embodiments:

> In one embodiment, once the delivery agent arrives at the selected location . . . , the delivery agent activates a wearable real-time video device [], which provides the customer with a real-time view of the selected location as seen by the delivery agent.  In one embodiment, . . . [t]he delivery agent then enters the shopping location and identifies the product of interest.  The delivery agent then communicates to the customer that the product has been identified, and the customer has the option of inspecting the product in real-time . . . .  If the customer chooses to inspect the product, the customer will communicate instructions to the delivery agent . . . , and the delivery agent will utilize [the] real-time video device [] to transmit real-time data to [the] customer computer [].  In a preferred embodiment, instructions are in the form of several pre-approved commands.  For example, the customer may request that the delivery agent zoom-in on a particular feature, zoom out, pan right or pan left. . . .  Next, the customer either approves or rejects acquisition of the inspected product.

'594 Patent at 6:41–66; '191 Patent at 6:42–67; '067 Patent at 6:57–7:15; *see also* '835 Patent at 7:12–47 (similar but using a "digital image capture device").  One "preferrabl[e]" use of the real-time video device is "to show the location of the delivery agent as the agent is driving to a desired purchase location . . . ." '594 Patent at 8:4–6; '191 Patent at 8:5–9; '067 Patent at 8:22–25; *see*

*also* '835 Patent at 8:60–63 (similar).  Agents check-off items as they are acquired so that "a customer can view the updates to their e-shopping list in real-time . . . ."  '594 Patent at 8:63–9:3, Claim 9; '191 Patent 8:65–9:4; '067 Patent at 9:16–21; '835 Patent at 9:61–66.

Thus, the written descriptions of the Asserted Patents clarify that real-time data transmission must be quite close in time.  Only sufficiently immediate transmissions could permit a customer to tell a delivery agent to pan around on the image of a product or to know the location of the delivery agent "as the agent is driving."  The prosecution history accords with this conclusion.[2]  However, the parties do not appear to dispute the close proximity between data capture and data transmission.  In fact, the *Markman* hearing left the Court in doubt as to whether the parties have any dispute at all.  The Court sees no reason that a "real-time" transmission of data could not both involve no inherent delay and permit a system that requires multiple "clicks" to operate, and the parties cite to no intrinsic evidence that excludes either party's preferred interpretation.  However, the parties have declined to agree on a construction.

First, a transmission need not be simultaneous or instantaneous to be "real-time."  The written description of the '835 Patent accounts for image transmission time and does not limit that time to the actual travel time of the data.  *See* '835 Patent at 10:14–19 (explaining that "real-time imaging and the like" must "encompass[] time require[d] to transmit the data between the customer and delivery agent" including, e.g., "the time needed to transmit the information over the internet").  While multiple preferred embodiments in the Asserted Patents allow the customer to

---

[2] The patentee distinguished the invention of the '191 Patent from the prior art because, in part, one piece of prior art did not "suggest a real-time tele-presence of the mobile agent" and a combination of two pieces of prior art did not "teach real-time video device capabilities or a telepresence and streaming real-time video to a customer . . . ."  D.I. 70-1 at CMRN 520–21.  The patentee also explained that "there is no disclosure in the art that suggests that the customer can view, by real-time video, progress information during performance of the acquisition of the actual product to be purchased as claimed."  D.I. 70-1 at CMRN 482.

view video as the delivery agent takes the video, the claims are broader than the preferred embodiments. For example, Claim 4 of the '594 Patent says only that the delivery agent must receive "instructions from the first customer . . . to remotely inspect the first set of . . . goods utilizing the real-time video device[,]" not that the customer must be able to instruct the delivery agent about slight camera movements, as the preferred embodiment teaches.

Second, the parties appear to agree upon a source for the appropriate definition of "real time." Exhibit 1 to Consumeron's opening brief, an entry from the online dictionary "Techopedia," provides as follows:

> The basic definition of real-time data is that it is data that is not kept or stored, but is passed along to the end user as quickly as it is gathered. It is important to note that real-time data does not mean that the data gets to the end user instantly. There may be any number of bottlenecks related to the data collection infrastructure, the bandwidth between various parties, or even just the slowness of the end user's computer. Real-time data does not promise data within a certain number of microseconds. It just means that the data is not designed to be kept back from its eventual use as it is collected.

D.I. 72-1 at 1. Instacart argued during the *Markman* hearing that the Court should adopt the definition from Techopedia and find that real-time data "is data that is not kept or stored but is passed along to the end user as quickly as it is gathered[.]" D.I. 193 at 50:8–19. However, the Asserted Patents explain that "video footage" taken by the "[r]eal-time video device" preferably "is stored . . . and can be accessed for delivery agent evaluation, for liability[,]" and for other purposes. *See* '594 Patent at 8:4–12; '191 Patent at 8:5–13; '067 Patent at 8:22–30; *see also* '835 Patent at 8:60–9:2 (also including storage of "still images"). Instacart agreed during the *Markman* hearing that it would accept Consumeron's proposed construction—plain and ordinary meaning, which is "data that is passed along as it is gathered"—if Consumeron would concede that there is

no intentional delay.  D.I. 193 at 41:1–11.  Consumeron then agreed that its construction did not include any "intentional delay" in data transmission.[3]  *Id.* at 41:23–42:7.

Neither party asserts that the intrinsic evidence suggests a specialized definition of "real time."  *See* D.I. 73 at 9 ("Instacart's proposed construction conveys a commonsense distinction between 'real-time' data and other forms of data."); D.I. 72 at 12 ("'Real-time' does not require a specialized construction and should be given its plain and ordinary meaning.").  As discussed above, the Court may consult a dictionary "to assist in understanding the commonly understood meaning of words"—here, the phrase "real time."  *Phillips*, 415 F.3d at 1322.  As the parties both appear to agree, and as the Techopedia dictionary explains, real-time data is data that is passed along as it is gathered.  Thus, the Court construes "real time" to take its plain and ordinary meaning, which is "data that is passed along as it is gathered."

### G.  "communication means for processing the acquisition request from the customer and establishing direct communication between the customer and the selected delivery agent during both the acquisition and delivery of the one or more goods to the customer" (the "Communication Means" term)

Consumeron argues that the Communication Means term is a means-plus-function term, while Instacart argues that it is indefinite.  D.I. 161-1 at 2.  Consumeron argues that the patentee

> identified the structure for performing the claimed functions of the "communications means" of: (1) "processing the acquisition request from the customer" and (2) "establishing direct communication between the customer and the selected delivery agent."  The specification explains how server 14 and communications device 48 perform both the functions . . . .

D.I. 72 at 5.  Instacart argues that the Communication Means "term is indefinite because neither the 'server' nor 'communications device' discloses sufficient structure, which must include an

---

[3] Consumeron argued at the *Markman* hearing that real-time data "is not designed to be kept back from its eventual use[,]" D.I. 193 at 43:10–44:9, but Instacart refused to agree to that language, *id.* at 49:22–50:5.

algorithm for performing the claimed processing." D.I. 73 at 16. Instacart must "prov[e] indefiniteness by clear and convincing evidence." *BASF Corp.*, 875 F.3d at 1365.

Claim 11 of the '191 Patent claims

11. A system for remote acquisition and delivery of one or more goods based on an acquisition request from a customer through an interactive interface for processing the acquisition request comprising:

. . .

communication means for processing the acquisition request from the customer and establishing direct communication between the customer and the selected delivery agent during both the acquisition and delivery of the one or more goods to the customer . . . .

First, the claim uses the word "means" and, thus, creates a "rebuttable presumption" that a term is a means-plus-function term. *Williamson*, 792 F.3d at 1348. The parties agree that the Court should analyze the Communication Means term as a means-plus-function term. *See* D.I. 72 at 5; 73 at 16. Second, the term claims two functions: "processing the acquisition request from the customer" and "establishing direct communication between the customer and the selected delivery agent[.]" '191 Patent at Claim 11; *see also* D.I. 72 at 5; D.I. 73 at 16. Since the claim term does not specify the structure that performs these two functions, *see* D.I. 72 at 5 (referring to the written description for the corresponding structure), the Court must evaluate whether "the [written description] or prosecution history clearly links or associates th[ose] structure[s] to the function recited in the claim." *Rain Computing*, 989 F.3d at 1007 (citation omitted).

Cosumeron identifies "server 14" as the structure for "processing the acquisition request" and communications device 48 as the structure for "establishing direct communication." D.I. 72 at 5. Instacart argues that Consumeron's structures are "nothing more than a general-purpose computer." D.I. 73 at 16. Consumeron responds that it identifies "a specialized server and communication device . . . ." D.I. 79 at 7. Where a means-plus-function claim limitation

27

must be implemented in a special purpose computer, [the Federal Circuit] has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor. [It] require[s] that the specification disclose an algorithm for performing the claimed function. The algorithm may be expressed as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure.

*Williamson*, 792 F.3d at 1352 (citations omitted).

The '191 Patent teaches that "[a] services provider is equipped with at least one server **14** in communication with a wide area network (WAN), such as the internet []." '191 Patent at 2:56–58. The server stores "[a] plurality of databases" that may include "a customer database" and "a billing database[,]" and it has an affiliated "real-time video processor[.]" *Id.* at 3:8–12, fig. 1. In a preferred embodiment, the server receives data from "classified ads or internet retailers" and may host an "e-shopping list" created by a consumer "utilizing an image and data capture device" that transfers information to the server. *Id.* at 5:39–46, 8:51–64. Customers may then "view the updates to their e-shopping list in real time through their computer's connection to server **14**." *Id.* at 9:2–4. The server must be able "to generate product reviews" via "data or images" that the customer or a real-time video processor captures and to store "video footage . . . for delivery agent evaluation" and other tasks. *Id.* at 8:10–13, 9:4–9.

"Communications system **48** preferably includes an on-board computer and transceiver system for wirelessly accessing a [WAN] or virtual private network (VPN) and system servers." *Id.* at 3:19–22. The communications device, which may be "a portable Internet device or an onboard display unit located in the agent's vehicle[,]" must be able to receive "customer account information[.]" *Id.* at 5:25–28. The device must also "enable staff [of a participating retailer] or delivery agents . . . to communicate with a customer" and may be able to "retrieve the customer's e-shopping list and check items off the list as they are obtained[.]" *Id.* at 8:38–43, 8:65–9:2.

Instacart argues that a server with a processor and a communications device with a computer and transceiver are simply generic computers with no disclosed algorithm to undertake the claimed functions. D.I. 73 at 16–17. Consumeron responds that the structures it identifies "are not general-purpose computers as Instacart urges, but rather, are a specialized server and communication device . . . ." D.I. 79 at 7. The Court finds that Instacart has failed to meet its burden to make a clear and convincing showing of indefiniteness because Instacart fails to demonstrate that the asserted structures are simply generalized computers. The server contains multiple databases and a video processor, and the server may be configured to communicate with internet retailers, receive data and images, show a viewer real-time updates to an e-shopping list, and generate product reviews via submitted data and images. The communication device has an on-board computer and transceiver to access a WAN or VPN and can be configured to check off items from the e-shopping list. Instacart makes no showing—such as via language from the patent specification or via extrinsic evidence—that a general purpose computer can perform such functions.[4] Instacart argues that Consumeron has the burden to show an algorithm to perform the functions described, D.I. 78 at 15, but Instacart, not Consumeron, bears the burden of proof as to indefiniteness.

Consumeron proposes the following construction for the Communication Means term:

**Function**: "processing the acquisition request from the customer and establishing direct communication between the customer and the selected delivery agent during both the acquisition and delivery of the one or more goods to the customer"

**Structure**: server 14 and communications device 48 as described in '191 Patent at 2:54–3:22, 5:36–50, 8:15–18, 8:49–9:4

---

[4] Consumeron also argues that the '191 Patent discloses an algorithm for the server's use. *See* D.I. 193 at 91:25–92:25 (citing '191 Patent at 8:53–55, 3:8–13, 8:15–18). The Court need not and does not reach this issue.

D.I. 161-1 at 2. The function language comes directly from Claim 11 of the '191 Patent, so the Court adopts Consumeron's statement of the function. As discussed above, the Court finds support for the proposed structure of server 14 in the '191 Patent at fig. 1, 2:56–58, 3:8–12, 5:39–46, 8:10–13, and 8:51–9:9, and of communications device 48 in the '191 Patent at 3:19–22, 5:25–28, 8:38–43, and 8:65–9:2. However, one function requires "direct communication *between* the *customer and the selected delivery agent* . . . ." '191 Patent at Claim 11 (emphases added). The '191 Patent teaches that "a communications link" may be "established between the customer and the selected delivery agent . . . , such as through a telephone or internet connection." *Id.* at 5:20–25. It provides no further description of a "telephone," save that customer computer 30 may be "a cell phone." *Id.* at 2:60–67. Further, the '191 Patent clarifies that the customer may use customer computer 30 to communicate with an agent. *See, e.g., id.* at 8:49–9:2 (describing communication of an e-shopping list input by the customer via customer computer 30 to communications device 48). The Court finds that the structure clearly linked or associated with the claimed function, *see Rain Computing*, 989 F.3d at 1007, must include a customer device capable of establishing communication with the delivery agent, such as a telephone or customer computer 30.

Thus, the Court construes the structure as "server 14, communications device 48, and a customer device capable of establishing communication with the delivery agent."

### H. "a real-time video means for sending at least one image to the customer through the communication means and transmitting real-time data to the display for the customer to view the one or more goods and the respective agent's progress during performance of the acquisition request" (the Video Means term)

The parties agree that the Video Means term is a means-plus-function term and that the function is "sending at least one image to the customer through the communication means and transmitting real-time data to the display for the customer to view the one or more goods and the respective agent's progress during performance of the acquisition request[.]" D.I. 161-1 at 2–3.

30

The parties disagree on the structure: Consumeron contends that the structure is the MDAS, while Instacart asserts that it is "[MDAS] 42, server 14, and customer computer 30[.]" *Id.* However, during the *Markman* hearing, Instacart explained that it would be comfortable with a structure of communication device 48, real-time video device 46, server 14, and customer computer 30, only. D.I. 193 at 102:4–24.

The claims and written description must "clearly link[] or associate[]" the corresponding structure to the agreed-upon function. *Rain Computing*, 989 F.3d at 1007. First, Consumeron argues that "the identified function does not require a server or the customer computer" because the function only requires sending an image and transmitting data, rather than processing the data or displaying the images. D.I. 79 at 10. The asserted function comes from Claim 11 of the '191 Patent, which claims

> 11. A system for remote acquisition and delivery of one or more goods based on an acquisition request from a customer through an interactive interface for processing the acquisition request comprising:
>    . . .
>> a real-time video means for sending at least one image to the customer through the communication means and transmitting real-time data to the display for the customer to view the one or more goods and the respective agent's progress during performance of the acquisition request.

Since the stated purpose of the function is for the customer "to view" goods and agent progress, the structure must include a way to view the image. Furthermore, the function explicitly requires "sending" an image "through the communication means," so the function also uses the structures that support "the communication means." Thus, both "the display" and "the communication means" are necessary structures to execute the function that the Video Means term claims.

Second, "the communication means" refers to the Communications Means term, which the Court construes as a means-plus-function term that has as its structure server 14, communications device 48, and a customer device, such as customer computer 30, capable of establishing

communication with the delivery agent. Thus, all three structures are required to send "at least one image to the customer through the communication means . . . ." *Id.*

Third, the "display," which is claimed in Claim 11 of the '191 Patent, is "for displaying to the customer at least the generated view" and the "view [is] of a pick-up site associated with [a] third-party vendor . . . ." The '191 Patent teaches that "user access[]" occurs "via a customer computer **30**" and that, "[i]f the customer chooses to inspect the product, . . . the delivery agent will utilize real-time video device **46** to transmit real-time data to customer computer **30**." '191 Patent at 2:58–60, 6:56–59. Similarly, "[t]he real-time video device is utilized to deliver real-time video of the delivery agent on the way to the location, as well as video captured during execution of a purchase process" and "the [delivery] agent will electronically transfer an image of the requested goods using real-time video device **46** . . . ." *Id.* at 2:20–23, 6:18–20. During the *Markman* hearing, Consumeron asserted that the structure need only send either video or still images, so real-time video device 46 was unnecessary. D.I. 193 at 99:20–100:24. However, portions of the written description to which Consumeron cited during its live presentation discussed "real-time video device **46**." *See Id.* at 99:20–100:6 (citing in Consumeron's demonstrative, e.g., '191 Patent at 6:36–39, 8:5–9, 8:38–43). Also, the MDAS described in the '191 Patent includes real-time video device 46, '191 Patent at 3:12–16, and, unlike Claims 1 and 14, Claim 11 of the '191 Patent does not separately define a MDAS. Thus, both real-time video device 46 and customer computer 30 are required to transmit "real-time data to the display for the customer to view . . . ." *Id.* at Claim 11. Further, the Court need not separately require a customer device capable of establishing communication with the delivery agent because customer computer 30 is an example thereof.

Thus, the Court adopts the parties' agreed-upon function and construes the structure as "server 14, communications device 48, real-time video device 46, and customer computer 30." The Court finds support for the structure in the '191 Patent at fig. 1, 2:20–23, 2:58–60, 6:18–20, 6:36–39, 6:56–59, 8:5–9, 8:38–43, 8:65–9:2, 9:4–9, and Claim 11.

### I. "means for sending one or more images in real-time to the customer from the mobile agent through the local communication link and providing the customer with progress information via real-time imaging of the one or more images from the mobile agent to the customer computer during performance of the acquisition request, including viewing the one or more goods from a pick-up site for the one or more goods during the shopping event" (the Sending Images Means term)

Instacart argues that this term is indefinite because the term "progress information via real-time imaging of the one or more images" is "nonsensical" and indefinite. D.I. 73 at 19. However, the Court found the "progress information" term definite, *see* Section III.E., *supra*, so the Court rejects Instacart's argument here as well.

Since the Court construes the term as definite, the parties agree on—and the Court adopts—the following function:

> sending one or more images in real-time to the customer from the mobile agent through the local communication link and providing the customer with progress information via real-time imaging of the one or more images from the mobile agent to the customer computer during performance of the acquisition request, including viewing the one or more goods from a pick-up site for the one or more goods during the shopping event[.]

*See* D.I. 72 at 9; D.I. 73 at 19 (not contesting the function in Consumeron proposal). Consumeron proposes that the only structure is the MDAS, which includes only a real-time video device and a communication device. D.I. 72 at 9. Instacart proposed that, if the Court found the term definite, "the corresponding structure includes the mobile delivery agent system, server, and customer computer." D.I. 73 at 19. However, Instacart clarified during the *Markman* hearing that its focus is on the customer computer and server. *See* D.I. 193 at 109:10–17.

33

Consumeron ties its proposed structure to the structure of the Video Means term, above. D.I. 79 at 11. Here, the function requires "sending one or more images in real-time to the customer[.]" '191 Patent at Claim 14. The '191 Patent teaches that "[t]he customer is allowed to interact with the delivery agent to inspect the product remotely using the real-time video device and the communications device." *Id.* at 2:23–25. The '191 Patent also teaches that "[r]eal-time video device **46** is preferably utilized throughout the transaction . . . to show the product at the purchase location . . . ." *Id.* at 8:5–9. In one preferred embodiment, "glasses with an embedded real-time video processor **46** and a communications device **48** [] enable . . . delivery agents . . . to communicate with a customer." *Id.* at 8:38–43. Further, "real-time video processor **46**" "capture[s]" "data or images[.]" '191 Patent at 9:4–9. Thus, the Court finds that real-time video device 46 and communication device 48 are required to carry out the claimed function.

However, the Court finds those structures insufficient. The claimed function of the Sending Images Means term requires "sending one or more images . . . to the customer from the mobile agent through the local communication link and providing the customer with progress information . . . from the mobile agent to the customer computer during performance of the acquisition request, including viewing the . . . goods . . . ." *Id.* at Claim 14. The "customer computer" is "configured to establish a local communication link between the customer and mobile agent[,]" so sending images "through the local communication link" or "to the customer computer" requires the presence of the customer computer. *Id.* The written description teaches that "the delivery agent will utilize real-time video device **46** to transmit real-time data to customer computer **30**." *Id.* at 6:56–59. Thus, the Court finds that customer computer 30, the only customer computer the '191 Patent teaches, is also a required structure. Lastly, the '191 Patent teaches that the server is "in communication with a [WAN], such as the internet." *Id.* at 2:56–58. However,

Claim 14 claims a customer connected to the delivery agent via a "local communication link," and the '191 Patent teaches that "a communications link is established between the customer and the selected delivery agent . . . , *such as* through a telephone or internet connection." *Id.* at 5:20–25 (emphasis added). Thus, the Court does not find server 14 necessary to carry out the claimed function here. Instead, any "communication link" that connects the customer and agent would provide sufficient structure to carry out the claim term.

Thus, the Court construes the Sending Images Means term as a means-plus-function term with the function recited above and the structure "real-time video device 46, communications device 48, customer computer 30, and a communication link capable of connecting the customer and agent." The Court finds support for its structure in the '191 Patent at 2:23–25, 5:20–25, 6:56–59, 8:5–9, 8:38–43, 9:4–9, and Claim 14.

### J. "communication means, establishing direct communication between the customer and the mobile agent, for communicating approval by the customer to the mobile agent in connection with completing the acquisition request" (the "Direct Communication" term)

The parties agree that the Direct Communication term, from Claim 14 of the '191 Patent, is a mean-plus-function term and that the claimed function is "establishing direct communication between the customer and the mobile agent, for communicating approval by the customer to the mobile agent in connection with completing the acquisition request[.]" D.I. 72 at 10–11; D.I. 73 at 18. Consumeron argues that its "proposed structure, communication device 48, is sufficient for communicating between the customer and the mobile agent, which is all that is required by this claim term." D.I. 72 at 11. Instacart argues that "both the [MDAS] and customer computer are required to carry out the term's agreed-to function." D.I. 73 at 18. However, during the *Markman* hearing, Instacart said it would be "okay with" the inclusion of only some elements of MDAS 42. D.I. 193 at 81:9–19.

The '191 Patent teaches that "[t]he customer is allowed to interact with the delivery agent to inspect the product remotely using the real-time video device and the communications device." '191 Patent at 2:23–25.  If a customer chooses to inspect a product, the '191 Patent teaches an embodiment in which "the customer will communicate instructions to the delivery agent . . . , and the delivery agent will utilize real-time video device **46** to transmit real-time data to customer computer **30**. . . .  Next, the customer either approves or rejects the acquisition of the inspected product."  *Id.* at 6:56–67.  In one embodiment, "participating retailers may provide . . . glasses with an embedded real-time video processor **46** and a communications device **48** to enable . . . delivery agents . . . to communicate with a customer."  *Id.* at 8:38–43.

Consumeron is correct that the delivery agent needs a device set up to communicate with a remote server to communicate with the customer.  Since the '191 Patent does not teach a "communications device" other than communications device 48, communication device 48 must be part of the required structure.  However, in the embodiment of the '191 Patent that discusses customer approval, the delivery agent "utilize[s] real-time video device **46** to transmit real-time data to customer computer **30**" and "the customer either approves or rejects the acquisition of the [] product."  '191 Patent at 6:51–67.  Thus, the written description clarifies that real-time video device 46—a device that may "capture[]" "data or images[,]" *id.* at 9:4–5—must also be part of the Direct Communication term's structure.

Consumeron argues that the customer computer is not part of the necessary structure because "[i]t is not the customer computer that 'establishes' the communication" or "that informs the mobile agent of the approval . . . ."  D.I. 79 at 12.  However, the '191 Patent teaches that the delivery agents, not the customers, hold the real-time video processor and the communications device.  '191 Patent at 3:13–16 & 29–32 (teaching that agents may "carry a battery pack(s) to

supply power to devices **46–49**[,]" which include real-time video device 46 and communications device 48), fig. 1. The claimed function requires that the customer also be allowed to "communicat[e] approval . . . to the mobile agent in connection with completing the acquisition request[.]" *Id.* at Claim 14. The claimed invention does not provide any device for the customer to view the information provided by the delivery agent or to communicate approval back to the delivery agent other than the customer computer. *See id.* at 2:23–27 (permitting agent-customer interaction "using the real-time video device and the communications device" and teaching that the customer "approve[s]" a purchase), 6:56–67 ("[T]he delivery agent will utilize real-time video device **46** to transmit real-time data to customer computer **30**. . . . Next, the customer either approves or rejects acquisition . . . ."). Thus, the Court finds that the structure includes customer computer 30.

Accordingly, the Court finds that the Direct Communication term is a means-plus-function term, adopts the parties' agreed upon function, and finds that the structure is "real-time video device 46, communications device 48, and customer computer 30." The Court finds support for its structure in the '191 Patent at 2:23–27, 3:29–32, 6:51–67, 8:38–43.

### K. Permissible Scope of the Parties' Arguments Before the Jury

"[I]t is improper to argue claim construction to the jury because the 'risk of confusing the jury is high when experts opine on claim construction.'" *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1337 (Fed. Cir. 2009) (citation omitted); *Bd. of Regents*, 2022 WL 17039729, at *10 (same); *C R Bard, Inc. v. AngioDynamics Inc.*, 2018 WL 3130622, at *11 (D. Del. June 2 to 6, 2018) (similar). Thus, the parties should not revisit before the jury the Court's decisions here.

Instacart has conceded that the entirety of MDAS 42 is not part of the necessary structure for the Direct Communication term and the Video Means term, and the Court has rejected Consumeron's argument that only the MDAS, as construed above, or "communication device 48"

is the necessary structure for those terms and for the Sending Images Means term. *See* Sections III.H., III.I., III.J., *supra*. The Court has also found that "real-time" data may be kept or stored and does not require instantaneous or simultaneous transmission, *see* Section III.F., *supra*, that "various geographic locations" does not require a specific city or neighborhood, *see* Section III.B., *supra*, and that MDAS does not include all of the elements of MDAS 42 in figure 1 or require the use of the internet or a mobile computing device, *see* Section III.C., *supra*. Lastly, the Court has rejected Instacart's arguments that the "most efficiently carry out" term, the "progress information" term, the Communications Means term, and the Sending Images Means term are indefinite. *See* Sections III.D., III.E., III.G., III.I. *supra*. The parties may not repeat any of these arguments before the jury.

## IV.    CONCLUSION

For the reasons explained above, the Court adopts the ten (10) constructions described herein.

The Court will issue an Order consistent with this Memorandum Opinion.